USAO2016R00596/CAH/NPG/DAL

**FILED**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FEB 1 4 2019

AT 8:30 _4:06 p_ M
WILLIAM T. WALSH
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. |
| | : Criminal No. 19- 120 KM |
| | : |
| v. | : 18 U.S.C. § 371 |
| | : 15 U.S.C. § 78dd-1 |
| | : 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B) |
| GORDON J. COBURN and | : 78m(b)(5), 78ff(a), 78ff(c)(2)(A) |
| STEVEN SCHWARTZ | : 18 U.S.C. § 2 |

**INDICTMENT**

The Grand Jury in and for the District of New Jersey, sitting at

Newark, charges:

**COUNT ONE**
**(Conspiracy to Violate the Foreign Corrupt Practices Act)**

**Relevant Individuals and Entities**

1.      At all times relevant to this Indictment:

a.      Cognizant Technology Solutions Corporation

("Cognizant") was an international corporation providing information

technology and consulting services.  Cognizant was headquartered in Teaneck,

New Jersey, and incorporated in Delaware.  Cognizant had more than 250,000

employees globally, more than half of whom worked in various locations in

India, including in and around the Indian state of Tamil Nadu.  Cognizant's

shares were registered with the U.S. Securities and Exchange Commission

("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934, and

the company was required to file periodic reports with the SEC under Section

13 of the Securities Exchange Act. Accordingly, Cognizant was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(a).

b.      Cognizant Technology Solutions India Private Limited ("Cognizant India") was a wholly owned subsidiary of Cognizant. Cognizant India and its employees were "agents" of an issuer within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a). Cognizant and Cognizant India are hereinafter referred to collectively as "Cognizant."

c.      Defendant GORDON J. COBURN ("COBURN") was the President of Cognizant. Between in or about January 2007 and in or about February 2012, COBURN served as Cognizant's Chief Financial and Operating Officer. As part of his responsibilities, COBURN oversaw Cognizant's acquisition and development of property in India, where Cognizant had substantial operations. COBURN was a United States citizen and an officer, employee, agent, and stockholder of an issuer within the meaning of the FCPA.

d.      Defendant STEVEN SCHWARTZ ("SCHWARTZ") was the Executive Vice President, Chief Legal and Corporate Affairs Officer of Cognizant. SCHWARTZ was responsible for managing Cognizant's global legal, government affairs, and security teams. SCHWARTZ also was responsible for overseeing and managing Cognizant's compliance functions. SCHWARTZ was a United States citizen and an officer, employee, agent, and stockholder of an issuer within the meaning of the FCPA.

e.     The "Construction Company" was a large engineering and construction firm with an office in Chennai, India.

f.     "CC#1," a co-conspirator not charged as a defendant herein, resided in India and was the Vice President of Administration at Cognizant.  CC#1 was responsible for managing infrastructure and real estate development on behalf of Cognizant in India.  CC#1 reported to CC#2 and, in many instances, directly to COBURN.

g.     "CC#2," a co-conspirator not charged as a defendant herein, resided in India and was Cognizant's Chief Operating Officer.  CC#2 had direct oversight over CC#1 and reported directly to COBURN.

h.     "CC#3," a co-conspirator not charged as a defendant herein, resided in India and was the Department Head for Commercial Buildings at the Construction Company.

**<u>Overview of the Bribery Scheme</u>**

2.     Between in or about January 2014 and in or about January 2016, COBURN, SCHWARTZ, and others engaged in a scheme to bribe one or more government officials in India to secure and obtain a planning permit (the "Planning Permit") necessary for construction of an office campus in the state of Tamil Nadu that would support approximately 17,000 Cognizant employees and become one of Cognizant's largest facilities in India (the "KITS Campus"). The Indian government officials were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

3.      In or about April 2014, COBURN and SCHWARTZ authorized an unlawful payment of approximately $2 million to one or more foreign government officials in India to secure and obtain the Planning Permit, which was discretionary and non-routine.  To conceal Cognizant's involvement in the scheme, COBURN, SCHWARTZ, CC#1, CC#2, and others agreed that the Construction Company would obtain the Planning Permit by making the illegal bribe payment and that Cognizant would reimburse the Construction Company through construction invoices at the end of the KITS Campus project.

4.      In or about late June 2014, after the co-conspirators had agreed that the Construction Company would make the bribe payment on behalf of Cognizant, the Construction Company secured the necessary government order (the "Government Order") for Cognizant to obtain the Planning Permit, allowing Cognizant to complete the development of the KITS Campus and avoid millions of dollars in costs.  Months later, the co-conspirators caused Cognizant to funnel over $2 million to the Construction Company, disguised as payment for cost overruns on the KITS Campus, when they knew that the actual purpose of the payment was to reimburse the Construction Company for the bribe payment.  As COBURN, SCHWARTZ and others had previously agreed, they hid the bribe reimbursement payment within a series of line items in a construction change order request to be paid to the Construction Company, thereby concealing the true nature and purpose of the reimbursement, falsifying Cognizant's books and records, and circumventing its internal controls.

## Background

### A.    *The Construction Company Begins Work on the KITS Campus*

5.    In or about November 2011, Cognizant retained the Construction Company to develop the KITS Campus. Cognizant's contract with the Construction Company provided that the Construction Company would obtain all statutory approvals and permits. The Construction Company was permitted at the end of the project to seek from Cognizant reimbursement for unanticipated costs associated with the agreed-upon scope of work through "variation claims" or "change order requests." COBURN was responsible for approving Cognizant's payment of such claims in excess of $500,000. CC#1 oversaw development of the KITS Campus on behalf of Cognizant, served as one of Cognizant's primary liaisons with the Construction Company, and provided regular updates to COBURN.

6.    The Planning Permit was a statutory approval that was required prior to the commencement of construction of the KITS Campus. Despite that requirement, it was common practice in India to apply for pre-construction statutory approvals, such as the Planning Permit, after construction began.

7.    On or about February 7, 2013, approximately fourteen months after beginning work on the KITS Campus, the Construction Company submitted an application and fee for the Planning Permit.

**B.**    ***Delays Prevent Cognizant from Obtaining the Planning Permit***

8.    In or about November 2013, approximately eight months after the Construction Company submitted Cognizant's Planning Permit application, a local development authority (the "Development Authority") conditionally approved and forwarded the application to a separate agency for consideration for the Government Order, a required step in obtaining the Planning Permit.

9.    By in or about mid-January 2014, the government agency had not yet issued the Government Order.  As a result, the Construction Company proposed that members of Cognizant's senior management meet with certain high-level officials of the Tamil Nadu government to assist with securing and obtaining the Planning Permit.  Cognizant declined to meet with Tamil Nadu officials concerning the Planning Permit application, maintaining instead that it was the Construction Company's responsibility to secure the necessary approvals.

10.    By in or about early March 2014, COBURN became aware that the Construction Company had not obtained the Planning Permit due to delays with the Government Order.

**C.**    **COBURN and SCHWARTZ Authorize a Bribe Payment to Secure and Obtain the Planning Permit**

11.    In or about late April 2014, COBURN and SCHWARTZ authorized the payment of an approximately $2 million bribe to ensure that Cognizant would receive the Planning Permit for the KITS Campus.

12.    On or about April 21, 2014 and April 22, 2014, COBURN and SCHWARTZ participated in two video conference calls with CC#1 and CC#2. During the calls, CC#1 advised that the Construction Company had received a bribe demand for approximately $2 million from one or more government officials in India in connection with the Planning Permit application for the KITS Campus.

13.    COBURN, SCHWARTZ, CC#1, and CC#2 agreed during these calls that the Construction Company would pay the bribe, and that Cognizant would reimburse the Construction Company for the bribe payment. At CC#1's suggestion, COBURN, SCHWARTZ, CC#1 and CC#2 agreed that Cognizant would reimburse the Construction Company for the bribe payment through a change order request at the end of the project. SCHWARTZ agreed that CC#1's suggested approach was acceptable, but cautioned that the reimbursement payment should not stand out in the change order request.

14.    To increase the pressure on the Construction Company to obtain the Planning Permit and to pay the bribe, COBURN directed CC#1 to freeze and withhold all future payments to the Construction Company until it had obtained all necessary permits for the KITS Campus and to notify the Construction Company that its future business with Cognizant was in jeopardy.

15.    After receiving authorization for the bribe from COBURN and SCHWARTZ, CC#1 advised the Construction Company that Cognizant would withhold all future payments to the Construction Company until it secured the

necessary approvals, including the Planning Permit, for the KITS Campus. The co-conspirators understood that the bribe demand had to be paid for Cognizant to receive the Planning Permit. Several weeks later, the Construction Company advised CC#1 that it would take the necessary steps to secure and obtain the Planning Permit, and that it had hired a special third-party consultant to make the bribe payment.

16.    On or about May 17, 2014, CC#3 emailed CC#1, writing: "As committed, we are going ahead with approval part (not to inform your site team & others, except your top management if required so)." CC#3 also noted that Cognizant had approximately $17 million in outstanding bills and asked for CC#1's assistance in getting Cognizant to pay those bills. CC#1 forwarded that email to, among others, COBURN and CC#2. CC#1's email stated that Cognizant had "some positive traction" on the KITS Campus "approval process" and that the Construction Company was "moving full swing on the process." CC#1 also wrote that the Construction Company had "appointed a new liaison consultant to process the approval" and that the Construction Company "was confident [Cognizant] will receive approval by this month end/early June." CC#1 noted that "the freeze on payment is hurting them very badly." CC#1's email also stated that the total "on hold" payments were approximately $17 million and that CC#1 believed that it was a "good idea to release payment." COBURN responded, via email, "Suggest you pay 7mm and hold the balance 10m until they deliver."

17.    A few weeks later, COBURN sought an update on the Planning Permit, but COBURN instructed the co-conspirators not to discuss the matter over email.  Thus, on or about June 16, 2014, CC#2 sent CC#1 an email that read, "[COBURN] wanted an update on the [KITS Campus] approval (no mails he said)."

**D.    *Cognizant Obtains the Planning Permit***

18.    On or about June 30, 2014, CC#3 emailed a scanned copy of the Government Order to CC#1 and others, writing: "As discussed, nobody should know that [the Construction Company] has got this [Government Order.]  Request to maintain this confidentiality."  Later that day, CC#1 sent the scanned Government Order, without CC#3's note, to several Cognizant executives, including COBURN, SCHWARTZ, and CC#2.  In the email, CC#1 wrote, "We will now start firm planning for occupation. Thanks to [the Construction Company] for support."

19.    Later that day, CC#1 asked COBURN to unfreeze the remaining $10 million owed to the Construction Company.  COBURN instructed CC#1, via email, to "pay $5mm of the $10mm" but to "hold the other $5mm until all approvals are finalized and received."

20.    On or about November 5, 2014, the Development Authority issued the Planning Permit to Cognizant.  Five days later, on or about November 10, 2014, CC#1 emailed COBURN, copying CC#2 and others, stating that the Development Authority had issued the Planning Permit and

recommending that Cognizant release the remaining funds that Cognizant had previously frozen.  Two days later, COBURN responded, via email, "OK."

21.    By obtaining the Planning Permit, Cognizant was able to complete construction of the KITS Campus, resulting in a significant business advantage that allowed the company to avoid costly delays and related expenses, including expenses associated with supporting thousands of India-based employees in different facilities.

### E. *Cognizant Reimburses the Construction Company for the Bribe Payment*

22.    In or about late 2014, as the KITS Campus project neared completion, the Construction Company began submitting change order requests to Cognizant for reimbursement of unanticipated construction costs. Specifically, the Construction Company submitted a list of approximately forty-five claims totaling approximately $25 million.

23.    Consistent with the plan agreed to by COBURN, SCHWARTZ, CC#1 and CC#2 in April 2014, the Construction Company included in its claims list an approximately $3.7 million claim for "approvals/campus regularization," which included an approximately $2.5 million request for "statutory approvals – planning permit."  This request corresponded to the amount the Construction Company demanded as reimbursement for the approximately $2 million bribe payment and related expenses.

24.    To disguise the reimbursement for the approximately $2 million bribe payment, CC#1 instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of the claims list – one

that replaced the $3.7 million "approvals/campus regularization" request with eleven previously-rejected claims worth roughly the same amount. This substitution ensured that the Construction Company was made whole for the bribe payment without having to document the true purpose of the reimbursement.

25.    Based on their communications with their co-conspirators, COBURN and SCHWARTZ knew that the reimbursement for the bribe would be and was included in the amount Cognizant agreed to pay the Construction Company, and that the co-conspirators would and did falsify the change order documents to conceal the payment. COBURN thereafter approved the reimbursement to the Construction Company based on the false change order request.

26.    Based on COBURN's approval, between in or around March 2015 and in or around January 2016, Cognizant issued several separate payments to the Construction Company to cover the cost of the Construction Company's change order requests, including approximately $2.5 million for the bribe reimbursement and related expenses.

**The Conspiracy**

27.    From in or about January 2014 through in or about January 2016, in the District of New Jersey and elsewhere, the defendants,

**GORDON J. COBURN**
**and**
**STEVEN SCHWARTZ,**

did knowingly and willfully conspire and agree with others to commit offenses against the United States, namely:

(a) being an officer, director, employee, and agent of an issuer, and a stockholder thereof acting on behalf of such issuer, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Cognizant in obtaining and retaining business, for and with, and directing business to, Cognizant and others, to wit: COBURN and SCHWARTZ

authorized Cognizant and its agents to pay and cause to be paid an approximately $2 million bribe to any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official to secure and obtain a planning permit required for Cognizant to construct a large office campus in India, contrary to Title 15, United States Code, Sections 78dd-1 and 78ff(c)(2)(A);

(b) to knowingly and willfully, directly and indirectly, falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Cognizant, an issuer organized under the laws of the United States, and its assets, contrary to Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a); and

(c) to knowingly and willfully, directly and indirectly, circumvent and cause to be circumvented, and fail to implement, a system of internal accounting controls at Cognizant sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was

taken with respect to any differences, contrary to Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a).

### Goal of the Conspiracy

28.    The goal of the conspiracy was for COBURN, SCHWARTZ, and their co-conspirators to illegally benefit Cognizant and themselves by improperly securing and obtaining a required planning permit for the KITS Campus by bribing one or more government officials in India; falsely recording payments relating to the bribe on Cognizant's books, records, and accounts; and circumventing and failing to implement Cognizant's internal accounting controls.

### Manner and Means of the Conspiracy

29.    It was part of the conspiracy that:

a.    COBURN, SCHWARTZ, CC#1, CC#2, and others agreed to reimburse the Construction Company for the payment of an approximately $2 million bribe to one or more government officials in India to ensure that Cognizant would obtain the Planning Permit necessary to develop the KITS Campus.

b.    COBURN, SCHWARTZ, CC#1, CC#2, and others agreed that Cognizant would reimburse the Construction Company for the bribe payment through construction invoices, or change orders, at the end of the KITS Campus project.

c.    After the co-conspirators agreed that the Construction Company would make the bribe payment on behalf of Cognizant, the

Construction Company obtained the Government Order, a necessary step in securing the Planning Permit, and sent a copy of it to Cognizant.

       d.     The Construction Company sought reimbursement from Cognizant for the bribe payment through a change order request.

       e.     CC#1 and others acting at CC#1's direction altered the Construction Company's change order request to conceal the bribe payment reimbursement.

       f.     Based on the agreement with SCHWARTZ and others during the April 2014 calls referenced above, COBURN approved the final change order request and authorized Cognizant to pay the Construction Company approximately $2.5 million as reimbursement for the bribe payment and related expenses.

       g.     To conceal Cognizant's reimbursement for the bribe payment, COBURN, SCHWARTZ, and others, falsified and caused to be falsified Cognizant's books, records, and accounts. For example:

       i.     COBURN, SCHWARTZ, and others approved and caused the approval of false change order requests and related approvals in connection with the KITS Campus.

       ii.     COBURN, SCHWARTZ, and others, in connection with the preparation of Cognizant's SEC filings, made and caused to be made false, fraudulent, and misleading representations and omissions in Sarbanes-Oxley Quarterly Global 302 Certifications for the quarter ending June 30, 2014 and the quarter ending March 31, 2015, including, but not

limited to, falsely certifying that Cognizant's internal controls had been in force and effective, and that they had disclosed to Cognizant's Chief Executive Officer and Chief Financial Officer all known deficiencies in the operation of the internal controls and any known fraud involving management or other employees who had a significant role in Cognizant's internal controls.

        iii.      COBURN, SCHWARTZ, and others, in connection with the preparation of Cognizant's filing of its annual report with the SEC, made and caused to be made false, fraudulent, and misleading representations and omissions in Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaires for the year ended December 31, 2014 and the year ended December 31, 2015, including, but not limited to, providing false answers to questions relating to: bribes or kickbacks; disguised or intentionally misrecorded entries in Cognizant's books and records; and transactions that may have violated Cognizant's Code of Conduct.

        h.     To conceal Cognizant's reimbursement for the bribe payment, COBURN, SCHWARTZ, and others, circumvented and caused others to circumvent, and failed to implement, Cognizant's system of internal accounting controls, including, but not limited to, controls relating to payments and approvals for accounts payable, and controls relating to Cognizant's SEC filings, such as Sarbanes-Oxley Quarterly Global 302 Certifications and Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaires.

## **Overt Acts**

30.     In furtherance of the conspiracy and to achieve the unlawful objects thereof, at least one of the co-conspirators committed and caused to be committed, in the District of New Jersey and elsewhere, at least one of the following overt acts, among others:

a.     On or about April 21, 2014, COBURN, SCHWARTZ, CC#1, and CC#2 participated in a video conference call relating to the illegal agreement to pay a bribe to one or more foreign government officials in India.

b.     On or about April 22, 2014, COBURN, SCHWARTZ, CC#1, and CC#2 participated in a video conference call relating to the illegal agreement to pay a bribe to one or more foreign government officials in India.

c.     On or about April 22, 2014, COBURN directed CC#1 to advise the Construction Company that Cognizant would withhold future payments to the Construction Company until the Construction Company secured all necessary government permits and approvals for the KITS Campus.

d.     On or about June 30, 2014, CC#1 sent an email to COBURN, SCHWARTZ, CC#2, and others attaching the Government Order the Construction Company had obtained.

e.     On or about January 13, 2015, CC#1 sent an email to COBURN and others that included a chart summarizing the Construction Company's pending change order requests.  The chart contained a line item for statutory approvals.

       f.     On or about on February 3, 2015, COBURN responded to CC#1's January 13, 2015 email referenced in Paragraph 30(e), "Approved."

       g.     On or about March 13, 2015, COBURN sent an email to a member of Cognizant's finance unit authorizing a payment to the Construction Company that included reimbursement for the $2 million bribe that the co-conspirators agreed the Construction Company would pay on Cognizant's behalf.

       All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FOUR
(Foreign Corrupt Practices Act)

    1.     Paragraphs 1 through 26 and 28 through 30 of Count One of this Indictment are realleged and incorporated by reference as if fully set forth herein.

    2.     On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendants,

**GORDON J. COBURN**
**and**
**STEVEN SCHWARTZ,**

each being an officer, director, employee, and agent of an issuer, and a stockholder thereof acting on behalf of such issuer, did willfully use the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Cognizant in obtaining and retaining business, for and with, and

directing business to, Cognizant and others, to wit: COBURN and SCHWARTZ

authorized Cognizant to pay and cause to be paid an approximately $2 million

bribe to any person, while knowing that all or a portion of such money or thing

of value will be offered, given, or promised, directly or indirectly, to any foreign

official to secure and obtain a planning permit required for Cognizant to

construct a large office campus in India, as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------------------|------------------------------------------------------------------------|
| Two | April 21, 2014 | COBURN email to SCHWARTZ, CC#1, and CC#2 requesting a call the next morning to follow up from their discussion in their April 21, 2014 call. |
| Three | May 20, 2014 | COBURN email to CC#1 and others instructing CC#1 to continue to freeze certain payments to the Construction Company. |
| Four | March 13, 2015 | COBURN email to CC#1 and others authorizing Cognizant to pay the Construction Company for certain false change order requests in connection with the KITS Campus. |

In violation of Title 15, United States Code, Sections 78dd-1 and

78ff(c)(2)(A), and Title 18, United States Code, Section 2.

## COUNTS FIVE THROUGH ELEVEN
(False Books and Records)

1.    Paragraphs 1 through 26 and 28 through 30 of Count One of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.    On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendants,

**GORDON J. COBURN**
**and**
**STEVEN SCHWARTZ,**

knowingly and willfully, directly and indirectly, falsified and caused to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Cognizant, an issuer of securities registered pursuant to the Securities Exchange Act of 1934, as set forth below:

| COUNT | APPROXIMATE DATE | DEFENDANT | FALSIFIED RECORD |
|---|---|---|---|
| Five | March 11, 2015 | COBURN | Spreadsheet and related approvals containing and incorporating false change order requests in connection with the KITS Campus. |
| Six | July 24, 2014 | COBURN | Sarbanes-Oxley Quarterly Global 302 Certification for the Quarter Ended June 30, 2014. |
| Seven | August 1, 2014 | SCHWARTZ | Sarbanes-Oxley Quarterly Global 302 Certification for the Quarter Ended June 30, 2014. |
| Eight | April 21, 2015 | COBURN | Sarbanes-Oxley Quarterly Global 302 Certification for the Quarter Ended March 31, 2015. |
| Nine | February 2, 2015 | SCHWARTZ | Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaire for the Year Ended December 31, 2014. |
| Ten | February 9, 2015 | COBURN | Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaire for the Year Ended December 31, 2014. |
| Eleven | February 6, 2016 | COBURN | Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaire for the Year Ended December 31, 2015. |

In violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.

**COUNT TWELVE**
(Circumvention of Required Internal Accounting Controls)

1.      Paragraphs 1 through 26 and 28 through 30 of Count One of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      From in or about January 2014 through in or about January 2016, in the District of New Jersey and elsewhere, the defendants,

**GORDON J. COBURN**
**and**
**STEVEN SCHWARTZ,**

knowingly and willfully, directly and indirectly, circumvented and caused to be circumvented, and failed to implement, a system of internal accounting controls of Cognizant, an issuer organized under the laws of the United States, sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; to wit, COBURN and SCHWARTZ circumvented and caused to be circumvented, and failed to implement, Cognizant's system of internal accounting controls, including, but not limited to, controls relating to payments and approvals for

accounts payable, and controls relating to Cognizant's SEC filings, such as

Sarbanes-Oxley Quarterly Global 302 Certifications and Annual Report on

Form 10-K and Proxy Statement Disclosure Questionnaires.

      In violation of Title 15, United States Code, Sections 78m(b)(2)(B),

78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.


A TRUE BILL


Grand Jury Foreperson


CRAIG CARPENITO
UNITED STATES ATTORNEY

ROBERT ZINK
ACTING CHIEF
FRAUD SECTION
CRIMINAL DIVISION

CASE NUMBER: 19-CR-120(KM)

## United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

**GORDON J. COBURN and**
**STEVEN SCHWARTZ**

## INDICTMENT FOR
18 U.S.C. § 371
15 U.S.C. § 78dd-1

15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5), 78ff(a), 78ff(c)(2)(A)

18 U.S.C. § 2

A True Bill,

_____
**Foreperson**

**CRAIG CARPENITO**
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

COURTNEY A. HOWARD
NICHOLAS P. GRIPPO
*ASSISTANT U.S. ATTORNEYS*
DAVID LAST
*ASSISTANT CHIEF, FCPA UNIT*