UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        v.<br><br>GORDON J. COBURN and<br>STEVEN SCHWARTZ | Hon. Kevin McNulty<br><br>Crim. No. 19-120 (KM) |

---

BRIEF OF THE UNITED STATES IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR A BILL OF PARTICULARS

CRAIG CARPENITO
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:
NICHOLAS P. GRIPPO
COURTNEY A. HOWARD
Assistant United States Attorneys

DAVID A. LAST
SONALI D. PATEL
Trial Attorneys
Fraud Section
Department of Justice

## **TABLE OF CONTENTS**

**Page**

**TABLE OF AUTHORITIES** .......................................................................... iii

PRELIMINARY STATEMENT........................................................................ 1

STATEMENT OF FACTS................................................................................ 5

ARGUMENT................................................................................................. 14

I.   THE COURT SHOULD DENY SCHWARTZ'S MOTION TO DISMISS
     COUNTS THREE AND FOUR OF THE INDICTMENT BECAUSE THOSE
     COUNTS SUFFICIENTLY ALLEGE ALL OF THE ELEMENTS OF THE
     OFFENSE AS TO BOTH DEFENDANTS. ........................................... 14

II.  THE COURT SHOULD DENY COBURN'S MOTION TO DISMISS TWO
     OF THE THREE SUBSTANTIVE ANTI-BRIBERY COUNTS OF THE
     INDICTMENT BECAUSE THE UNIT OF PROSECUTION UNDER THE
     FCPA INCLUDES INTERSTATE TRANSMISSIONS IN FURTHERANCE
     OF A BRIBERY SCHEME.................................................................. 23

III. THE COURT SHOULD DENY COBURN'S MOTION TO DISMISS COUNT
     TWELVE OF THE INDICTMENT BECAUSE THE FAILURE TO
     IMPLEMENT AND CIRCUMVENTION OF INTERNAL CONTROLS ARE
     NOT MUTUALLY EXCLUSIVE, AND REGARDLESS, THE
     GOVERNMENT IS PERMITTED TO CHARGE MULTIPLE THEORIES OF
     LIABILITY IN THE CONJUCTIVE IN ONE COUNT OF AN INDICTMENT.
     ........................................................................................................ 32

IV.  THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS FOR A
     BILL OF PARTICULARS BECAUSE THE DETAILED INDICTMENT AND
     FULSOME DISCOVERY PROVIDE THE DEFENDANTS WITH MORE
     THAN ENOUGH INFORMATION TO PREPARE THEIR DEFENSE AND
     AVOID UNFAIR SURPRISE. ............................................................. 36

A.   A Bill of Particulars Is Not Warranted Because The Indictment And
     Discovery Give Defendants More Than Enough Information About The
     Charged Crimes. ............................................................................. 37

B.   Responses to the Defendants' Requests for Particulars ..................... 41

     1.   Requests for the Identification of Unindicted Co-
          Conspirators and Other Unnamed Individuals ............... 41

2.  Requests for Identification of Foreign Government Officials and Third-Party Consultants............................ 47

3.  Request for Details Regarding Payments Made in Furtherance of the Bribery Scheme .............................. 52

4.  Request for Identification of Places Where Defendant Schwartz Acted and Conspired ....................................... 55

5.  Requests for Details Relating to Aiding and Abetting...... 56

6.  Requests for Detail Regarding Specific Misstatements.... 61

7.  Requests for Detail Regarding the Specific Portions of the FCPA Defendants are Alleged to have Violated ............... 69

8.  Requests for Information Regarding Failing to Implement and Circumventing Internal Accounting controls ........... 71

9.  Request for Detail Regarding the Benefits Schwartz Received ....................................................................... 74

CONCLUSION........................................................................... 75

# **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Brady v. Maryland*,
    373 U.S. 83 (1963) ............................................................................. 2, 40

*Castro v. United States*,
    248 F. Supp. 2d 1170 (S.D. Fla. 2003) ..................................................... 52

*Cohen v. Wilhelm*,
    63 F.2d 543 (3d Cir. 1933) ....................................................................... 32

*Douglas Oil Co. v. Petrol Stops Northwest*,
    441 U.S. 211 (1979) ................................................................................. 22

*Hamling v. United States*,
    418 U.S. 87 (1974) ................................................................................... 15

*N. Jersey Media Grp. Inc v. United States*,
    836 F.3d 421 (3d Cir. 2016) ..................................................................... 39

*Pereira v. United States*,
    347 U.S. 1 (1954) ..................................................................................... 18

*Pinkerton v. United States*,
    328 U.S. 640 (1946) ................................................................................. 21

*S.E.C. v. Jackson*,
    908 F. Supp. 2d 834 (S.D. Tx. 2016) ................................................. passim

*S.E.C. v. Straub*,
    No. 11-cv-9645, 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) ................. 17

*S.E.C. v. Straub*,
    921 F. Supp. 2d. 244 (S.D.N.Y. 2013) ......................................... 49, 50, 69

*United States v. Addonizio*,
    451 F.2d 49 (3d Cir. 1971) .............................................................. 39, 64

*United States v. Alsobrook*,
    620 F.2d 139 (6th Cir. 1980) ....................................................................30

*United States v. Alsugair*,
    256 F. Supp. 2d 306 (D.N.J. 2003) ......................................................... 47

*United States v. Andrews,*
  681 F.3d 509 (3d Cir. 2012) ............................................................ 17, 19

*United States v. Armocida,*
  515 F.2d 49 (3d Cir. 1974) ...................................................................... 68

*United States v. Atwell,*
  Crim. No. 13-560, 2015 WL 2092687 (D.N.J. May 5, 2015)..................... 41

*United States v. Beech-Nut Nutrition Corp.,*
  659 F. Supp. 1487 (E.D.N.Y. 1987)........................................................ 40

*United States v. Bellomo,*
  263 F. Supp. 2d 561 (E.D.N.Y. 2003) .................................................... 39

*United States v. Bentz,*
  21 F.3d 37 (3d Cir. 1994) ...................................................................... 18

*United States v. Bergrin,*
  650 F.3d 257 (3d Cir. 2011) .................................................................. 15

*United States v. Besmajian,*
  910 F.2d 1153 (3d Cir. 1990)................................................................. 15

*United States v. Boffa,*
  513 F. Supp. 444 (D. Del. 1980) ...................................................... 39, 73

*United States v. Booth,*
  309 F.3d 566 (9th Cir. 2002) ................................................................ 35

*United States v. Bortnovsky,*
  820 F.2d 572 (2d Cir.1987) ................................................................... 54

*United States v. Brown,*
  Crim. No. 90-00144-03, 1991 WL 7378 (E.D. Pa. Jan. 22, 1991)............30

*United States v. Caruso,*
  948 F. Supp. 382 (D.N.J. 1996) ....................................................... 37, 40

*United States v. Cerna,*
  No. 08-cr-0730, 2009 WL 2998929 (N.D. Cal. Sept. 16, 2009)................ 72

*United States v. Cooper,*
  966 F.2d 936 (5th Cir. 1992) ................................................................. 24

*United States v. Coughlin,*
  610 F.3d 89 (D.C. Cir. 2010) ................................................................ 35

*United States v. Cox,*
  536 F.3d 723 (7th Cir. 2008) ................................................................ 35

*United States v. Crayton,*
  357 F.3d 560 (6th Cir. 2004) ............................................................... 42

*United States v. Davidoff,*
  845 F.2d 1151 (2d Cir. 1988) ............................................................... 58

*United States v. DeChristopher,*
  695 F.3d 1082 (10th Cir. 2012) ........................................................... 35

*United States v. Deerfield Specialty Papers, Inc.,*
  501 F. Supp. 796 (E.D. Pa. 1980) ....................................................... 38

*United States v. DeLaurentis,*
  230 F.3d 659 (3d Cir. 2000) ................................................................ 15

*United States v. Dickey,*
  102 F.3d 157 (5th Cir. 1996) ............................................................... 35

*United States v. Douglass,*
  780 F.2d 1472 (9th Cir. 1986) ............................................................. 30

*United States v. Eisenberg,*
  773 F. Supp. 662 (D.N.J.1991) ........................................................... 47

*United States v. Eldridge,*
  No. 09-329A, 2010 WL 3749060 (W.D.N.Y. Sept. 20, 2010) .................... 59

*United States v. Espy,*
  989 F. Supp. 17 (D.D.C. 1997) ............................................................ 68

*United States v. Eufrasio,*
  935 F.2d 555 (3d Cir. 1991) ................................................................ 39

*United States v. Failla,*
  No. 93-cr-294, 1993 WL 547419 (E.D.N.Y. Dec 21, 1993) ................ 46, 59

*United States v. Falkowitz,*
  214 F. Supp. 2d 365 (S.D.N.Y. 2002) .................................................. 46

*United States v. Felder,*
  2007 WL 172368 (E.D. Pa. Jan. 11, 2007) ........................................... 31

*United States v. Feola,*
  651 F. Supp. 1068 (S.D.N.Y. 1987) ..................................................... 59

*United States v. Fischbach & Moore, Inc.,*
  776 F.2d 839 (9th Cir. 1985) ................................................................ 22

*United States v. Freeman,*
  619 F.2d 1112 (5th Cir. 1980) .............................................................. 68

*United States v. Garcia-Torres,*
  341 F.3d 61 (1st Cir. 2003)................................................................... 35

*United States v. Gatto,*
  746 F. Supp. 432 (D.N.J. 1990) ................................................. 45, 47, 56

*United States v. Giovengo,*
  637 F.2d 941 (3d Cir.1980) .................................................................. 18

*United States v. Gordon,*
  875 F.3d 26 (1st Cir. 2016)...................................................................29

*United States v. Grasso,*
  173 F. Supp. 2d 353 (E.D. Pa. 2001) ................................................... 41

*United States v. Green,*
  No. 92-cr-159, 1993 WL 652793 (W.D.N.Y. Sept. 21, 1993) .............. 58, 59

*United States v. Hedgepeth,*
  434 F.3d 609 (3d Cir.2006) ........................................................... 47, 68

*United States v. Holman,*
  490 F. Supp. 755 (E.D. Pa. 1980) ........................................................ 56

*United States v. Holzwanger,*
  No. 10-cr-714, 2011 WL 1741920 (D.N.J. May 4, 2011) ........................ 47

*United States v. Hoskins,*
  902 F.3d 69 (2d Cir. 2018) ...................................................57, 59, 60, 61

*United States v. Howard,*
  742 F.3d 1334 (11th Cir. 2014) ........................................................... 35

*United States v. Hsia,*
  24 F. Supp. 2d 14 (D.D.C. 1998) ......................................................... 66

*United States v. Hubbard,*
  474 F. Supp. 64 (D.D.C. 1979) ............................................................ 68

*United States v. Huet,*
  665 F.3d 588 (3d Cir.2012) ................................................................. 20

*United States v. Jabali,*
  Crim. No. 01-801, 2003 WL 22170595 (E.D.N.Y. Sept. 12, 2003) 39, 54, 56

*United States v. Jennings,*
  471 F.2d 1310 (2d Cir.1973) ................................................................. 52

*United States v. Jones,*
  447 F. App'x 319 (3d Cir. 2011) ........................................................... 56

*United States v. Kay,*
  513 F.3d 432 (5d Cir. 2007) ........................................................... 26, 27

*United States v. Kemp,*
  500 F.3d 257 (3d Cir. 2007) ................................................................ 15

*United States v. Lacerda,*
  No. 12-cr-303, 2013 WL 3177814 (D.N.J. June 19, 2013) ...................... 67

*United States v. Leonelli,*
  428 F. Supp. 880 (S.D.N.Y. 1977) ........................................................ 58

*United States v. Ligambi,*
  No. 09-cr-496, 2012 WL 2362638 (E.D. Pa. June 21, 2012) ................... 42

*United States v. Lino,*
  No. 00-cr-632, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ........................... 46

*United States v. Lopez,*
  271 F.3d 472 (3d Cir. 2001) ................................................................ 21

*United States v. Mannino,*
  480 F. Supp. 1182 (S.D.N.Y. 1979) ................................................. 38, 57

*United States v. Mariani,*
  90 F. Supp. 2d 574 (M.D. Pa. 2000) ................................................ 38, 46

*United States v. McAuliffe,*
  490 F.3d 526 (6th Cir. 2007) .............................................................. 35

*United States v. McDavid,*
  No. CR-S-06-35, 2007 WL 926664 (E.D. Cal. Mar. 27, 2007) ................. 73

*United States v. McDonough,*
  56 F.3d 381 (2d Cir. 1995) ................................................................. 35

*United States v. McDowell,*
  888 F.2d 285 (3d Cir. 1989) ............................................................... 22

*United States v. McGuiness,*
  764 F. Supp. 888 (S.D.N.Y. 1991) ........................................................ 55

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008) ................................................................ 35

*United States v. Mongomery,*
  262 F.3d 233 (4th Cir. 2001) .............................................................. 35

*United States v. Moyer,*
  674 F.3d 192 (3d Cir. 2012) .......................................................... 64, 66

*United States v. Munoz,*
  736 F. Supp. 502 (S.D.N.Y. 1990) ...................................................... 40

*United States v. Nachamie,*
  91 F. Supp. 2d 565 (S.D.N.Y. 2000) .................................................... 46

*United States v. Needham,*
  No. 04-cr-196, 2004 WL 1903061 (S.D.N.Y. Aug. 26, 2004) ................... 42

*United States v. Niederberger,*
  580 F.2d 63 (3d Cir. 1978) ................................................................ 34

*United States v. Pacchioli,*
  718 F.3d 1294 (11th Cir. 2013) .......................................................... 35

*United States v. Petersen,*
  622 F.3d 196 (3d Cir.2010) ............................................................... 20

*United States v. Polizzi*
  500 F.2d 856 (9th Cir. 1974)............................................................... 30

*United States v. Pollen,*
  978 F.2d 78 (3d Cir. 1992) .......................................................... 24, 31

*United States v. Procter & Gamble,*
  356 U.S. 677 (1957) ......................................................................... 22

*United States v. Rajarantnam,*
  No. 13-cr-00211, 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014) ................ 34

*United States v. Ramirez,*
  602 F. Supp. 783 (S.D.N.Y. 1985) ...................................................... 46

*United States v. Redding,*
  540 F. Supp. 2d 1184 (D. Kan. 2008) .................................................. 46

*United States v. Reifler,*
  446 F.3d 65 (2d Cir. 2006) .................................................................... 17

*United States v. Resendiz-Ponce,*
  549 U.S. 102 (2007) ............................................................................ 15

*United States v. Rigas,*
  605 F.3d 194 (3d Cir. 2010) ................................................................ 24

*United States v. Rodriguez,*
  No. 99-cr-367, 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ...................... 42

*United States v. Rogers,*
  617 F. Supp. 1024 (D. Colo. 1985) ....................................................... 66

*United States v. Rosa,*
  891 F.2d 1063 (3d Cir. 1989) .............................................................. 38

*United States v. Roy,*
  408 F.3d 484 (8th Cir. 2005) .............................................................. 35

*United States v. Schiff,*
  538 F. Supp. 2d 818 (D.N.J. 2008) ................................................. 64, 65

*United States v. Smith,*
  776 F.2d 1104 (3d Cir. 1985).................................................... 39, 41, 43

*United States v. Song,*
  934 F.2d 105 (7th Cir. 1991) .............................................................. 24

*United States v. Sourlis,*
  953 F. Supp. 568 (D.N.J. 1996) ........................................................... 68

*United States v. Stock,*
  No. No. 11-cr-182, 2012 WL 202761 (W.D. Pa. Jan. 23, 2012) ............... 47

*United States v. Torres,*
  901 F.2d 205 (2d Cir. 1990) ............................................................... 42

*United States v. Trie,*
  21 F. Supp. 2d 7 (D.D.C. 1998) .................................................. 46, 65, 66

*United States v. Urban,*
  404 F.3d 754 (3d Cir. 2005) .......................................................... 38, 40

*United States v. Vasquez-Ruiz,*
  136 F. Supp. 2d. 941 (N.D. Ill. 2001) ................................................... 54

*United States v. Vastola,*
  670 F. Supp. 1244 (D.N.J. 1987) ...........................................44, 45, 47, 56

*United States v. Wabo,*
  290 F. Supp. 2d 486 (D.N.J. 2003) ........................................................ 41

*United States v. Whitted,*
  734 Fed. Appx. 90, (3d Cir. 2018) ........................................................ 21

*United States v. Williams,*
  Crim. No. 14-70, 2015 WL 4662706 (M.D. Pa. Aug. 6, 2015)............. 41, 44

*United States v. Williams,*
  No. 6:13-cr-26, 2013 WL 12203173 (M.D. Fl. Aug. 22, 2013) ................. 72

*United States v. Wilson,*
  No. 95-cr-668, 1997 WL 10035 (S.D.N.Y. Jan. 10, 1997) ................. 46, 55

*United States v. Wolff,*
  No. 11-cr-719, 2013 WL 646204 (D.N.J Feb 20, 2013) ...................... 45, 56

*United States v. Zolp,*
  659 F. Supp. 692 (D.N.J. 1987) ............................................................ 38

**Statutes**

15 U.S.C. § 78dd-1 ....................................................................... *passim*

18 U.S.C. § 1341 ................................................................................ 25

18 U.S.C. § 1343 ......................................................................... 17, 25

**Rules**

Fed. R. Crim. P. 7(c)(1)........................................................................ 14

Fed. R. Crim. P. 12(b)(3) ..................................................................... 15

Fed. R. Crim. P. 16 .......................................................................... 2, 40

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ................................................ 25

Foreign Corrupt Practices Act of 1977, H. Rpt. No. 95-831,
95th Cong. (1977)................................................................................. 28

x

Foreign Corrupt Practices and Domestic and Foreign Investment Improved Disclosure Acts of 1977, S. Rpt. 95-114, 95th Cong. (1977) ........................27

*Oxford English Dictionary* (2d ed. 1989)....................................................... 25

Unlawful Corporate Payments Act of 1977, H. Rpt. 95-640, 95th Cong. (1977)..................................................................................... 27

## PRELIMINARY STATEMENT

This case arises from a foreign bribery scheme involving Defendants Gordon J. Coburn ("Coburn"), the former President of Cognizant Technology Solutions Corporation ("Cognizant"), Steven Schwartz ("Schwartz"), the former Chief Legal Officer of Cognizant, and others.  On February 14, 2019, the grand jury returned a detailed twenty-four page, twelve-count Indictment charging Coburn and Schwartz with conspiracy to violate the Foreign Corrupt Practices Act's ("FCPA") anti-bribery provisions (Count One), three substantive FCPA anti-bribery charges (Counts Two through Four), seven counts alleging that Coburn and Schwartz falsified Cognizant's books and records (Counts Five through Eleven), and one count alleging that Coburn and Schwartz circumvented and failed to implement Cognizant's internal accounting controls (Count Twelve). (Indictment, Dkt. No. 1.)

The Government began rolling discovery productions in April 2019.  The bulk of the discovery was produced in April, including: documents that the Government obtained from Cognizant, as well as the entity referred to in the Indictment as the "Construction Company" (*see* Indictment at 3, paragraph 1.e.), bank records, medical records, cell phone records, other business records, and documents produced to the Government by witnesses.  Significantly, the Government has produced all FBI 302 reports of witness interviews conducted by the Government—a total of twenty-three reports, twenty-one of which were produced at the beginning of April.  These reports include references to documents shown to witnesses in interviews and include the specific bates

numbers of those documents, allowing the Defendants to locate them. In addition, the Government disclosed in detailed letters dated June 14, 2019 and June 24, 2019, the latter of which was over 100 pages, the substance of the information the Government received from counsel concerning employee interviews. Many of the documents and information the Government produced were disclosed as a courtesy and were outside of the scope of Rule 16, *Brady v. Maryland*, 373 U.S. 83 (1963), and other authorities.

On November 15, 2019, each Defendant filed a motion for a bill of particulars and a motion to dismiss certain counts of the Indictment. Specifically, Coburn filed a motion for a bill of particulars and a motion to dismiss two counts among Counts Two through Four as multiplicitous, as well as Count Twelve for "repugnancy." Schwartz also filed a motion for a bill of particulars, as well as a motion to dismiss Counts Three and Four of the Indictment. Each Defendant joined the other Defendant's motions.

The Court should deny the Defendants' motions in their entirety. A bill of particulars is required only if an indictment is too vague to permit the Defendants to understand the nature of the charges against them and prepare a defense, avoid unfair surprise, and assert a claim of double jeopardy where appropriate. The detailed Indictment in this case serves all of these functions. Beyond that, the Government's comprehensive discovery productions (including all law enforcement reports of witness interviews conducted by the Government) supplement the factual gaps alleged by the Defendants. But the Defendants seek far more than the law permits. The Defendants' motions for wide-ranging,

all-encompassing particulars are an effort to gain an unwarranted tactical advantage for trial by obtaining a detailed roadmap of the Government's trial strategy, and to limit the Government's presentation of evidence at trial, rather than a legitimate exercise in preparing a defense and avoiding unfair surprise. Because the Indictment coupled with the Government's extensive discovery clearly equip the Defendants with everything needed to understand the charges and prepare their defenses, a bill of particulars simply is not warranted here.

The Court also should reject the Defendants' challenges to the substantive FCPA counts of the Indictment (Counts Two through Four). Schwartz argues that Counts Three and Four do not allege the use of interstate commerce as to him because those counts reference emails sent by Coburn to third parties. But Schwartz's argument ignores that the charging language applicable to all three of these counts alleges that both Defendants used instrumentalities of interstate commerce in furtherance of the bribery scheme; the emails cited in Counts Three and Four were foreseeable actions in furtherance of the unlawful and corrupt plan to pay a bribe that Schwartz approved and agreed to follow; and, in any event, these counts also charge the accomplice statute, which serves as an alternative basis of criminal liability against either Defendant.

Similarly, Coburn's multiplicity attacks against two of the three substantive anti-bribery counts are meritless because they are based on an incorrect and overly narrow view of the unit of prosecution under the FCPA. The plain text of the statute makes clear that the use of any means or instrumentality of interstate commerce *in furtherance* of an authorization to pay a bribe to a

3

foreign official—here, Coburn's emails as charged in the Indictment—itself is conduct proscribed by, and chargeable under, the FCPA. Not surprisingly, Coburn does not cite any cases that narrowly interpret the FCPA the way he proposes, and the only courts that have addressed similar arguments have rejected them. This Court should do the same.

Finally, Coburn's challenge to Count Twelve is meritless because, contrary to his arguments with respect to that charge, a defendant can both circumvent and fail to implement a company's internal accounting controls, but regardless, it is perfectly appropriate for the Government to charge a disjunctive statute in the conjunctive. Whether these Defendants engaged in such conduct is a question of fact for the jury to resolve, and the allegations on their face are neither contradictory nor "repugnant."

## STATEMENT OF FACTS

In April 2014, during two separate video conference calls, defendants Coburn, Schwartz, and two co-conspirators who worked at Cognizant and are identified in the indictment as "CC#1" and "CC#2," agreed and authorized that Cognizant, through a third party construction company (the "Construction Company"), would pay a $2 million bribe to secure and obtain a government-issued planning permit (the "Planning Permit") required for Cognizant to complete construction of a large-scale office campus in Tamil Nadu, India (the "KITS Campus"). The Defendants and their co-conspirators understood that the bribe would be paid to one or more government officials in India with authority over the Planning Permit. This conduct occurred after months of consternation within and between Cognizant and the Construction Company over delays in obtaining the Planning Permit, and were followed by various steps the Defendants and their co-conspirators took to conceal their unlawful conduct.

Years earlier, in 2011, Cognizant retained the Construction Company to develop the KITS Campus. The KITS Campus was developed to be one of Cognizant's largest facilities in India and was planned to support over 17,000 employees. Cognizant's "turnkey" contract with the Construction Company provided that the Construction Company would obtain all statutory approvals and permits required to develop and construct the KITS Campus. As part of the contract, the Construction Company was permitted, at the end of the project, to seek from Cognizant reimbursement for unanticipated costs associated with the

agreed-upon scope of work through "variation claims" or "change order requests."

The Planning Permit was a statutory approval that was required prior to the commencement of construction of the KITS Campus. Despite that requirement, it was common practice in India to apply for pre-construction statutory approvals, such as the Planning Permit, after construction began. On or about February 7, 2013, approximately fourteen months after beginning work on the KITS Campus, the Construction Company submitted an application and fee for the Planning Permit. In or about November 2013, a local development authority (the "Development Authority") conditionally approved and forwarded the application to a separate agency for consideration for the "Government Order," a required step in obtaining the Planning Permit.

By in or about mid-January 2014, the government agency had not yet issued the Government Order which, consequently, prevented Cognizant from receiving the Planning Permit. As a result, the Construction Company proposed that members of Cognizant's senior management meet with certain high-level officials of the Tamil Nadu government to assist with securing and obtaining the Planning Permit. Cognizant declined to meet with Tamil Nadu officials concerning the Planning Permit application, maintaining instead that it was the Construction Company's responsibility to secure the necessary approvals.

Throughout this time, CC#1, who as Vice President of Administration at Cognizant, was responsible for managing infrastructure and real estate development on behalf of Cognizant in India, closely monitored the progress of

6

the KITS Campus project and the status of obtaining Planning Permit approval from the government.  In early 2014, CC#1 learned that the Construction Company had received a bribe demand from a government official in India and that the Planning Permit would not be issued until Cognizant (or a third party acting on its behalf) paid the bribe.  CC#1 reported the demand to CC#2 and, ultimately, to Coburn and Schwartz.  Internal emails and other communications involving Cognizant employees during this time period confirm that a bribe demand had been made and was holding up the KITS Campus project.

On or about April 21, 2014, and April 22, 2014, Coburn and Schwartz participated in two video conference calls with CC#1 and CC#2 to discuss the status of the KITS Campus project, including the bribe demand.  During the calls, CC#1 advised Coburn and Schwartz that the Construction Company had received a bribe demand for approximately $2 million from one or more government officials in India in connection with the Planning Permit application. None of the participants of these two calls knew the specific identity of the government official or officials who had made the bribe demand, as the demand had been made to the Construction Company, not Cognizant.

Notably, Coburn, Schwartz, CC#1, and CC#2 agreed during these calls that the Construction Company would pay the bribe, and that Cognizant would then reimburse the Construction Company.  At CC#1's suggestion, Coburn, Schwartz, CC#1 and CC#2 agreed that Cognizant would reimburse the Construction Company for the bribe payment through the change order request process at the end of the project.  Schwartz agreed that CC#1's suggested

7

approach was acceptable, but cautioned that the reimbursement payment should not stand out in the change order documents.

In the course of these discussions, Coburn, Schwartz, CC#1, and CC#2 discussed a prior Cognizant real estate project in Pune, India that involved a bribe paid to obtain a required environmental clearance (the "Pune Project"). With respect to the Pune Project, the Construction Company paid the bribe and then Cognizant reimbursed it through change order requests. This bribe took place prior to CC#1's role managing real estate development in India, but CC#1 was aware of it. CC#1 discussed the Pune Project bribe with the Defendants and CC#2 during the April 2014 calls as a frame of reference for having the Construction Company pay the KITS bribe demand and then reimbursing the Construction Company through the change order process. In other words, the bribe in connection with the KITS Campus project would be handled using the same procedure as had been used in paying the bribe for the Pune Project.

To increase the pressure on the Construction Company to obtain the Planning Permit and to pay the bribe, Coburn directed CC#1 to freeze and withhold all future payments to the Construction Company until it had obtained all necessary permits for the KITS Campus. Coburn also directed CC#1 to notify the Construction Company that its future business with Cognizant was in jeopardy.

Schwartz took contemporaneous notes of the April 2014 video call communications; those notes corroborate witness testimony and further confirm

the details of the bribe demand and the co-conspirators' unlawful plan for dealing with it.  Specifically, Schwartz's notes read:

1. Missing planning permit
2. Common practice build without and get after
3. Lots of permits we start without
4. Also need consent to establish
5. All construction projects [the Construction Company] making small payments
6. This one is $2MM
7. Is this one big or normal? Pune project last year, ask from officials $670,000 – Normal rate.  [The Construction Company] spent more than it would normally spent. Change request for 12-14M. We only paid $3M.
8. One of highest demands we have seen
9. Here IAS[1] official; person supposed to not be part of politics. When govt changes, this person keeps job. Here it has gone up to the govt officials.
10. Money going where? We do not know.
11. $2M it is reas and cust in this govt.
12. Bill will come as change request.
13. Change request for a lot of line items.
14. Are we setting precedent.
16. $154 million. We have paid about $121 million. Bill $6.4 million.

Schwartz's statements in his notes, including "[t[his one is $2MM," "Pune project last year, ask from officials $670,000 – Normal rate," "One of highest demands we have seen," "$2M it is reas and cust in this govt.," "Bill will come as change request" and "Change request for a lot of line items," demonstrate exactly what occurred during these calls: the Defendants and their co-conspirators discussed the $2 million bribe by Indian government officials, agreed that the

---

[1] "IAS" appears to be a reference to the Indian Administrative Service, which is part of the Indian civil service.  The IAS is non-political and meant to guarantee administrative continuity in the Indian government.

payment needed to be made and that the Construction Company would make it, and agreed that Cognizant would reimburse the Construction Company, as it had previously done in connection with the Pune Project, by fabricating change orders using "a lot of line items."

After receiving authorization for the bribe payment from Coburn and Schwartz, CC#1 advised the Construction Company, as Coburn had instructed, that Cognizant would withhold all future payments to the Construction Company until it secured the necessary approvals, including the Planning Permit, for the KITS Campus.  The co-conspirators understood that the bribe demand had to be paid for Cognizant to receive the Planning Permit.

On or about May 17, 2014, CC#1 emailed, among others, Coburn and CC#2, and wrote that Cognizant had "some positive traction" on the KITS Campus "approval process" and that the Construction Company was "moving full swing on the process."  CC#1 also wrote that the Construction Company had "appointed a new liaison consultant to process the approval" and that the Construction Company "was confident [Cognizant] will receive approval by this month end/early June."  CC#1 noted that "the freeze on payment is hurting them very badly."  CC#1's email also stated that the total "on hold" payments were approximately $17 million and that CC#1 believed that it was a "good idea to release payment."  Coburn responded, via email, "Suggest you pay 7mm and hold the balance 10m until they deliver."

A few weeks later, Coburn sought an update on the Planning Permit, but Coburn instructed the co-conspirators not to discuss the matter over email.

Accordingly, on or about June 16, 2014, CC#2 sent CC#1 an email that read, "[Coburn] wanted an update on the [KITS Campus] approval (no mails he said)."

Shortly thereafter, Cognizant obtained the Government Order necessary for the Planning Permit. Specifically, on or about June 30, 2014, a senior representative from the Construction Company referred to in the Indictment as "CC#3," emailed a scanned copy of the Government Order to CC#1 and others, writing: "As discussed, nobody should know that [the Construction Company] has got this [Government Order.] Request to maintain this confidentiality." Later that day, CC#1 sent the scanned Government Order, without CC#3's note, to several Cognizant executives, including Coburn, Schwartz, and CC#2. In the email, CC#1 wrote, "We will now start firm planning for occupation. Thanks to [the Construction Company] for support."

On the same day Cognizant obtained the Government Order, CC#1 asked Coburn to unfreeze the remaining $10 million owed to the Construction Company. Coburn instructed CC#1, via email, to "pay $5mm of the $10mm," but to "hold the other $5mm until all approvals are finalized and received."

On or about November 5, 2014, the Development Authority issued the Planning Permit to Cognizant. Five days later, on or about November 10, 2014, CC#1 emailed Coburn, copying CC#2 and others, stating that the Development Authority had issued the Planning Permit and recommending that Cognizant release the remaining funds that Cognizant had previously frozen. Two days later, Coburn responded, via email, "OK."

By obtaining the Planning Permit, Cognizant was able to complete construction of the KITS Campus, resulting in a significant business advantage that allowed the company to avoid costly delays and related expenses, including expenses associated with supporting thousands of India-based employees in different facilities.

Thereafter, in or about late 2014, as the KITS Campus project neared completion, the Construction Company began submitting change order requests to Cognizant for reimbursement of unanticipated construction costs. The Construction Company submitted a list of approximately forty-five claims totaling approximately $25 million.

Consistent with the unlawful plan agreed to by Coburn, Schwartz, CC#1, and CC#2 in April 2014, the Construction Company included in its claims list an approximately $3.7 million claim for "approvals/campus regularization," which included an approximately $2.5 million request for "statutory approvals – planning permit." This request corresponded to the amount the Construction Company demanded as reimbursement for the approximately $2 million bribe payment and related expenses.

To disguise the reimbursement for the approximately $2 million bribe payment, CC#1 instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of the claims list – one that replaced the $3.7 million "approvals/campus regularization" request with eleven previously-rejected claims worth roughly the same amount. This substitution

12

ensured that the Construction Company was made whole for the bribe payment without having to document the true purpose of the reimbursement.

Based on their communications with their co-conspirators, Coburn and Schwartz knew that the reimbursement for the bribe was included in the amount Cognizant agreed to pay the Construction Company, and that the co-conspirators falsified the change order documents to conceal the payment. Coburn thereafter approved the reimbursement to the Construction Company based on the false change order request.

By authorizing the Construction Company to pay the bribe, the Defendants (and Cognizant more generally) were able to avoid interacting directly with the government official[s] who made the bribe demand and the third-party intermediary who paid it, thus concealing their involvement in the scheme. Indeed, neither the Defendants, nor CC#1 and CC#2, knew the identity of the government official[s] who sought the bribe, the individuals who served as the intermediary and paid it, or the details of the bribe payments. Likewise, to date, the Government's investigation has not uncovered this information.

Based on Coburn's approval, and Schwartz's previous directive that the reimbursement payment should not "stand out" in the change order documents, between in or around March 2015 and in or around January 2016, Cognizant issued several separate payments to the Construction Company to cover the cost of the Construction Company's change order requests, including approximately $2.5 million for the bribe reimbursement and related expenses.

On February 14, 2019, a grand jury in the District of New Jersey returned a twelve-count Indictment against the Defendants alleging violations of the FCPA and various related offenses, as described in more detail above.   Trial is tentatively scheduled for September 2020.

## **ARGUMENT**

I.   **THE COURT SHOULD DENY SCHWARTZ'S MOTION TO DISMISS COUNTS THREE AND FOUR OF THE INDICTMENT BECAUSE THOSE COUNTS SUFFICIENTLY ALLEGE ALL OF THE ELEMENTS OF THE OFFENSE AS TO BOTH DEFENDANTS.**

Schwartz seeks dismissal of Counts Three and Four of the Indictment because, according to him, those counts "fail to allege facts supporting the essential interstate commerce element of an FCPA violation" as to him.  (*See* Memorandum of Law in Support of Defendant Steven Schwartz's Motion to Dismiss and for a Bill of Particulars, Dkt. No. 57-1 (hereinafter "Schwartz Br.") at 10.)  He also argues that these counts are "vague and ambiguous" and that it is "unclear from the face of the [I]ndictment" whether he is charged in them.  (*Id.*)  Schwartz's arguments cannot be reconciled with the clear language of the Indictment, which plainly alleges that both Defendants used or caused to be used instrumentalities of interstate commerce in furtherance of the bribery scheme.  The Indictment also alleges facts sufficient to establish that such use of interstate commerce was reasonably foreseeable.  These allegations satisfy federal criminal pleading requirements.

An indictment must contain only a plain, concise, and definite written statement of the essential facts constituting the offense charged.  Fed. R. Crim. P. 7(c)(1).  "[T[he Federal Rules were designed to eliminate technicalities in

14

criminal pleadings and are to be construed to secure simplicity in procedure. [D]etailed allegations . . . surely are not contemplated by [Rule 7(c)(1)]." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quotations and citations omitted).  An indictment is sufficient, therefore, so long as it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (quotations and citation omitted).  Further, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution. *Id.* (quotations and citation omitted); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974) (similar standard under Constitutional requirements).

In evaluating a motion to dismiss, the court must accept as true all factual allegations in the indictment. *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990).  Dismissal under Rule 12(b)(3) "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000).  "Evidentiary questions — such as credibility determinations and the weighing of proof — should not be determined at this stage." *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011).

Contrary to Schwartz's assertions, Counts Two through Four unambiguously charge both Defendants with violating the FCPA's anti-bribery provisions.  Indeed, page 19 of the Indictment names both Defendants under the heading "Counts Two through Four" and then sets forth the statutory language and essential elements of the charge, including that *both* defendants "willfully use[d] the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an … authorization of the payment of" a bribe to a foreign government official.  (Indictment at 19.)  The chart on the following page of the Indictment identifies the specific means and instrumentalities of interstate and foreign commerce that support each of these three counts; all three are emails that Coburn sent in furtherance of the bribery scheme.  Schwartz argues that, because the emails referenced in Counts Three and Four were not sent to or from him, and are not otherwise expressly tied to him in the charging language, these counts do not allege the interstate commerce element as to him. He is wrong.

As Schwartz acknowledges, the Government is not required to allege that the defendant himself sent or caused to be sent the interstate communication or other instrumentality of interstate commerce alleged in the Indictment. (Schwartz Br. at 13.)  The courts that have addressed this issue in the FCPA context have noted that courts have interpreted this "element liberally in other contexts and have held that, in addition to direct use, it is sufficient if the defendant merely 'act[s] 'with knowledge that' the use of an instrumentality of interstate commerce 'will follow in the ordinary course of business,' or that 'such

use can reasonably be foreseen, even though not actually intended.'" *S.E.C. v. Straub*, 11-cv-9645, 2016 WL 5793398, *11 (S.D.N.Y. Sept. 30, 2016) (quoting *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006)). In *Straub*, an FCPA case, the court adopted the foreseeability standard applicable to the interstate commerce element of the mail and wire fraud statutes. *Id.* The court found that outcome "hardly in doubt" based on Second Circuit precedent applying the same foreseeability standard to other similarly-worded provisions of the federal securities laws. *Id.; see also United States v. Hoskins*, Crim. No. 12-238 (JBA) (D. Conn. 2019), Dk. No. 577 (transcript of jury instructions) at 1262 ("It is not necessary for the defendant to have been directly or personally involved in the charged wire as long as the wire was reasonably foreseeable in the execution of the alleged bribery scheme. In this regard, it is sufficient to establish this element of the crime if the evidence justifies a finding that the defendant caused the wires to be sent by others. This does not mean that the defendant must have specifically authorized others to make the wire. When one does an act with knowledge that the use of the wires will follow in the ordinary course of business or where such use of the wires can be reasonably foreseen, even though not actually intended, then he causes the wires to be used.")

The Third Circuit applies a similar foreseeability test to the interstate commerce element of the mail and wire fraud statutes. *See United States v. Andrews*, 681 F.3d 509, 529 (3d Cir. 2012). Those statutes do "not require that the defendant himself sent the communication or that he intended that interstate wire communications would be used." *Id.* Rather, "§ 1343 requires

that the defendant 'knowingly caused' the use of interstate wire communications." *Id.* (quoting *United States v. Bentz,* 21 F.3d 37, 40 (3d Cir. 1994)). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* (quoting *Pereira v. United States,* 347 U.S. 1, 8–9 (1954)); *see United States v. Giovengo,* 637 F.2d 941, 944 (3d Cir.1980) (explaining that "cases construing the mail fraud statute are applicable to the wire fraud statute as well").

The allegations in the Indictment satisfy the above standards. The Indictment alleges in detail that Schwartz, Coburn, and their co-conspirators agreed, among other details, that: (1) the Construction Company would pay a $2 million bribe to one or more government officials in India to secure and obtain the Planning Permit for the KITS Campus project (Indictment, ¶¶ 3, 11); (2) Cognizant would freeze all payments to the Construction Company until it obtained the Planning Permit (*Id.* ¶ 14); (3) Cognizant would reimburse the Construction Company for the bribe payment through the change order process at the end of the project (*Id.* ¶¶ 14); and (4) Cognizant would disguise the illegal reimbursement by fabricating the change orders to insert previously rejected line item requests from the Construction Company and portraying those items as approved expenses/costs associated with the project (*Id.* ¶¶ 14, 23-25). Counts Two through Four incorporate by reference all of these allegations.

Since the scheme alleged in the Indictment involved freezing payments to the Construction Company, and later fabricating change orders and other internal documents to conceal the reimbursement payments, it was reasonably foreseeable to Schwartz that those actions would require emails sent in interstate commerce. This is particularly apparent given that Schwartz and Coburn were located in the United States during the events alleged in the Indictment, and the KITS Campus project and many of the individuals and entities involved in it, including CC#1 and CC#2, were located in India. Further, as Cognizant's senior legal officer, it was reasonably foreseeable to Schwartz that Coburn would have to approve both the freezing and unfreezing of payments to the Construction Company during the project, and any payments made through the change order process. It was also reasonably foreseeable to Schwartz that all of those approvals from, and communications with, Coburn would require interstate communications such as email. *See Andrews*, 681 F.3d at 529 (finding that the use of interstate emails and faxes was reasonably foreseeable where the defendant instructed an individual located in New York to send bond transaction documents to an individual located in the Virgin Islands, and noting that "given the complexity of the bond application process, it was reasonably foreseeable that [those two individuals] would exchange multiple emails or faxes.").

Ultimately, these are jury questions and the Government will be prepared to present evidence to establish beyond a reasonable doubt the interstate commerce element as to both Defendants for all applicable counts. For now, the Indictment sufficiently alleges the use of interstate commerce in Counts Three

19

and Four as to Schwartz.  Accordingly, the Court should deny Schwartz's motion to dismiss.

For the same reasons, there is no basis to Schwartz's argument that the Indictment is ambiguous and vague as to whether Counts Three and Four charge him, and whether the grand jury understood the scope of those charges. (Schwartz Br. at 15.)  Schwartz's comparison of the chart on page 20 of the Indictment (addressing Counts Two through Four) with the chart on page 22 of the Indictment (addressing Counts Five through Eleven) is misplaced.  The second chart sets forth the false books and records counts, which charge each Defendant separately in different counts.  Since none of those counts charge both Defendants, the chart has a column that identifies the Defendant charged in each particular count of that series.  The chart for Counts Two through Four, in contrast, does not require such a column since both Defendants are charged in all three of those counts.  This approach is not confusing, complicated or contradictory; instead, it clarifies the exact counts charged against each Defendant.

Counts Three and Four also charge both Defendants under the accomplice liability statute, Title 18, United States Code, Section 2.  To establish a violation of Section 2, the Government must prove: "(1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission of the substantive offense and acted with the intent to facilitate it." *United States v. Huet,* 665 F.3d 588, 596 (3d Cir.2012) (quoting *United States v. Petersen,* 622 F.3d 196, 208 (3d Cir.2010)).  The "act" element

does not require that a criminal defendant participate in each and every element of the offense. *Id.* "In proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence,' ... even if that aid relates to only one (or some) of a crime's phases or elements." *Id.* at 1246–47. Accordingly, a jury may convict Schwartz of Counts Three and Four for aiding and abetting Coburn's violations of the FCPA as charged in those counts.

Similarly, Schwartz may be convicted of Counts Three and Four under the *Pinkerton* doctrine, which "permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy." *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)); *see also United States v. Whitted*, 734 Fed. Appx. 90, 93 (3d Cir. 2018) (non-precedential) ("The government may seek a conviction for a substantive criminal offense by introducing evidence that a defendant directly committed the offense or by proceeding on a theory of vicarious liability under *Pinkerton* or aiding and abetting."). These alternate theories of liability further undermine Schwartz's challenge to Counts Three and Four.

Since the Indictment on its face makes clear which Defendants are charged in each count, the Court should deny Schwartz's alternative request for the transcript of the legal instructions given to the grand jury. "As a matter of public

21

policy, grand jury proceedings generally must remain secret except where there is a compelling necessity." *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) (citing *United States v. Procter & Gamble*, 356 U.S. 677, 682 (1957)). "[D]isclosure of grand jury testimony is permitted only in limited circumstances." *United States v. Fischbach & Moore, Inc.*, 776 F.2d 839, 843 (9th Cir. 1985). Parties seeking disclosure "'must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.'" *Id.* (quoting *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979)).

Moreover, "a showing [of particularized need] must be made even when the grand jury whose transcripts are sought has concluded its operations[.]" *Douglas Oil Co.*, 441 U.S. at 222. In considering the effects of disclosure on grand jury proceedings, "courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries." *Id.*

Schwartz has not met this standard. His request relies on pure speculation that the grand jury was confused based on a flawed interpretation of the language of the Indictment. For the reasons stated above, that interpretation is inconsistent with the plain text of the Indictment. Therefore,

the Court should deny Schwartz's motion for access to the legal instructions the Government gave the grand jury.[2]

## II.    THE COURT SHOULD DENY COBURN'S MOTION TO DISMISS TWO OF THE THREE SUBSTANTIVE ANTI-BRIBERY COUNTS OF THE INDICTMENT BECAUSE THE UNIT OF PROSECUTION UNDER THE FCPA INCLUDES INTERSTATE TRANSMISSIONS IN FURTHERANCE OF A BRIBERY SCHEME.

Coburn seeks dismissal of two counts among Counts Two through Four of the Indictment on the grounds that those counts are multiplicitous because the Indictment alleges only one improper payment to an Indian government official in violation of the FCPA.  (*See* Memorandum of Law in Support of Defendant Gordon J. Coburn's Motion to Dismiss, Dkt. No. 58-1 (hereinafter "Coburn MTD Br.")).   According to Coburn, emails sent in furtherance of this bribe payment cannot constitute a federal offense under the plain language of the statute.  (*Id.* at 7.)   Coburn states, without any support or statutory analysis, that the "allowable unit of prosecution in a case brought under § 78dd-1 is a payment, or offer, promise, or authorization of payment." (*Id.* at 8.)  Coburn's arguments cannot be reconciled with the plain language of the FCPA, the legislative history of the statute, or with federal case law interpreting the statute, all of which make clear that the unit of prosecution is the use of interstate commerce in furtherance of an "offer, payment, promise to pay, *or* authorization of the payment." 15 U.S.C. § 78dd-1(a) (emphasis added).  Indeed, Coburn does not cite a single of

---

[2] Nonetheless, the Government would not object to providing a copy of the transcript to the Court for *in camera* review if the Court believes such review would be helpful in resolving Schwartz's motion.

case to support his novel theory about the "unit of prosecution" with respect to the FCPA, nor can he, because no such case exists.

"A multiplicitous indictment charges the same offense in two or more counts and may lead to multiple sentences for a single violation. . . ." *United States v. Pollen*, 978 F.2d 78, 84 (3d Cir. 1992). "[A] defendant may be subject to multiple prosecutions for the same conduct if Congress intended to impose multiple punishments for that conduct." *United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010). To determine whether an indictment properly charges separate offenses, the court must discern the unit of prosecution under the relevant statute. *Pollen*, 978 F.2d at 85. In making that inquiry, the court first looks to the language of the statute itself. *Id.* (citing *United States v. Cooper*, 966 F.2d 936, 942 (5th Cir. 1992)). Only if the statutory language is ambiguous must the court look to the legislative history of the statue. *Id.* (citing *United States v. Song*, 934 F.2d 105, 108 (7th Cir. 1991)).

The FCPA, 15 U.S.C. § 78dd-1 *et seq.*, prohibits an issuer from making "use of the mails or any means or instrumentality of interstate commerce corruptly *in furtherance of* an offer, payment, promise to pay, or authorization of the payment of any money or offer, gift, promise to give, *or* authorization of the giving of anything of value" to a foreign official. 15 U.S.C. § 78dd-1(a) (emphasis added). The language of the statute is clear – the use of the "mails" or "means or instrumentalities of interstate commerce" must be in furtherance of the offer, authorization, or payment to a foreign official. The word "furtherance" ordinarily means the "act or process of facilitating the progress of something or of making

24

it more likely to occur; promotion or advancement." *Black's Law Dictionary* (11th ed. 2019).  Similarly, the Oxford English Dictionary defines the word "furtherance" as "the fact or state of being furthered or helped forward; the action of helping forward; advancement; aid, assistance." *Oxford English Dictionary* (2d ed. 1989).  The clause "in furtherance of" in the statute thus makes clear that the use of interstate commerce is not merely jurisdictional, it is the unit of prosecution.  The use of interstate commerce for some other purpose that was not in furtherance of the offer, authorization, or payment would not meet the elements of the offense.[3]

Contrary to Coburn's arguments, the language in the alternative jurisdiction provision of the FCPA must be interpreted the same way, as it tracks the language of Section 78dd-1(a).  Section 78dd-1(g) prohibits any issuer from corruptly doing "any act outside of the United States *in furtherance of* an offer, payment, promise to pay, or authorization of the giving of anything of value" to a foreign official.  15 U.S.C. § 78dd-1(g) (emphasis added).  Here, the placement of the clause "in furtherance of" after "any act outside of the United States" and before "any offer . . .," makes clear that it is the act committed outside of the

---

[3] Coburn's attempt to distinguish the FCPA from the mail and wire fraud statutes is unavailing.  Because the plain language of the FCPA is consistent with the Government's charging theory, a comparison to the mail and wire fraud statutes in this context is unnecessary.  Nonetheless, both the mail and wire fraud statutes contain similar "in furtherance of" language as the FCPA.  Mail and wire fraud both require that the mailing or wire be sent "for the purpose of" executing a scheme to defraud.  *See* 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud).

United States in furtherance of the offer or payment that is the unit of prosecution.

The Fifth Circuit, in *United States v. Kay*, 513 F.3d 432 (5d Cir. 2007), looked to the plain language of the FCPA and came to the same conclusion. In *Kay*, the defendants argued that the indictment failed to allege that they made "use of the mails or any means or instrumentality of interstate commerce" in furtherance of a corrupt offer, payment, or promise to pay because the indictment alleged that they used barges and other methods of interstate commerce, including an overnight mail delivery service, to move false documents that underreported the amount of grain on barges going from the United States to Haiti. *Id.* at 452. According to the defendants, the government failed to prove that the documents were sent in interstate commerce in "furtherance" of the bribes. Instead, they claimed that the bribes, which were paid in cash in Haiti, were paid to clear the false shipping documents. *Id.* The court addressed the issue of whether a "defendant can only be convicted under the bribery portion of the FCPA if the defendant used the mails or other interstate commerce 'in furtherance of making the bribe itself' and not for more broad use of interstate commerce for activities that support the bribe payment." *Id.* at 453.

In deciding the question, the court declined to look at the legislative history of the FCPA, because the plain language of the statute was sufficiently clear that it applies "to defendants that 'make use of . . . any means or instrumentality of interstate commerce . . . in furtherance of an offer, payment, promise to pay, or authorization [to pay] . . . ." *Id.* This was especially true where the indictment

26

alleged that the defendant directed employees to prepare false shipping documents in furtherance of the bribe payments.

The defendants in *Kay*, like Coburn here, tried to portray the false shipping documents, each set of which were charged as a substantive FCPA count in the indictment, as a product of the bribes, rather than documents that were transmitted through interstate commerce in furtherance of the bribes. However, the court rejected that argument, because the evidence showed that the documents were used to calculate the bribes and thus sent in furtherance of paying the bribes, which were then paid in cash to government officials in Haiti. *Kay*, 513 F.3d at 453-54.

None of the cases cited by Coburn stands for the proposition that interstate commerce is incidental or jurisdictional in the FCPA, nor does the legislative history of the statute suggest anything of the sort. Indeed, the legislative history of the statute refutes Coburn's narrow understanding of the appropriate unit of prosecution. The House bill prohibited making "use of the mails, or of any means or instrumentality of interstate commerce, corruptly to offer, pay, or promise to pay, or authorize the payment, or any money" to a foreign official for an improper purpose. H.R. Rep. No. 95-640, at 7, 14 (1977). In commenting on the proposed legislation, the Department of Justice expressed reservations about the language in the House bill, because it "would require that the mails or instrumentality of interstate commerce be directly used to offer or make the prohibited payment." *Id.* at 18 (Letter of Patricia M. Wald, Ass't Att'y Gen. (Apr. 20, 1977)). The Department considered such a formulation to be

27

"unduly restrictive" and suggested that the language "be modified so as to provide that the mails or interstate facility need only be used *in furtherance* of the illicit payment, offer, et cetera." *Id.* (emphasis added). This language was already included in the Senate Bill. S. Rep. No. 95-114, at 17 (1977).

In conference, the House and Senate "adopted the identical provisions of both bills with the addition of the Senate 'in furtherance of' language." H.R. Conf. Rep. No. 94-831, at 12 (1977). The Conference Report explained it was adopting the Senate "in furtherance of" language because doing so made "clear that the use of interstate commerce need only be in furtherance of making the corrupt payment." This history underscores the point that the ""use of the mails, or of any means or instrumentality of interstate commerce" is not merely jurisdictional, and that the statute criminalizes multiple uses of the means or instrumentalities of interstate commerce in furtherance of one offer or payment.

Counts Two through Four charge Coburn and Schwartz with three substantive FCPA counts for three emails that Coburn sent "in furtherance" of the $2 million bribe paid by the Construction Company to Indian government officials. Count Two charges Coburn and Schwartz for an email sent by Coburn to Schwartz, CC#1, and CC#2 on April 21, 2014, requesting a follow up call after their call earlier on April 21, 2014 regarding the bribe demand. Count Three charges Coburn and Schwartz for an email that Coburn sent to CC#1 and others directing CC#1 to continue freezing payments to the Construction Company, in an effort to pressure the Construction Company to move quickly on the Planning Permit. Count Four charges Coburn and Schwartz for an email that Coburn sent

28

to CC#1 and others authorizing Cognizant to pay the Construction Company for the false change order requests to reimburse the Construction Company for making the bribe payment. These emails were not merely emails that were sent in relation to the bribe payment, or discussing the bribe payment. These emails were each sent to advance or progress the payment of the bribe and the conspiracy more generally in a meaningful way.

*United States v. Gordon*, 875 F.3d 26 (1st Cir. 2016), which the Defendants cite, is not inconsistent with the Government's position. In *Gordon*, the First Circuit considered the appropriate unit of prosecution under the murder for hire statute, 18 U.S.C. § 1958(a). The court determined, based on an analysis of statutory language and legislative history, that the unit of prosecution under the murder for hire statute was "a single plot to murder a single individual." *Id.* at 37. In coming to this conclusion, the court looked to the structure of the statute itself, which contains graduated punishments depending on the level of harm to the victim. The court found that this structure conveyed "a clear indication of Congress's apparent belief that the greater the harm to the victim, the harsher the punishment should be for the offender" and that a unit of prosecution that was based on each interstate act would "frustrate this congressional aim." *Id.* at 34. Moreover, the court found that the legislative history of the murder for hire statute made clear that Congress intended to penalize activity that was similar to that already captured by existing state laws. The "focal point" of the federal murder for hire statute "was [thus] a murder plot that had a federal nexus, not the federal nexus itself." *Id.* at 34. The FCPA, in contrast to

29

the murder for hire statute, does not have a similar tiered sentencing structure. Nor does the legislative history make references to existing state laws in explaining the purpose of a federal analogue.

In determining the unit of prosecution under the FCPA, an appropriate statutory comparison is the Travel Act, 18 U.S.C. § 1952. Courts have long defined the appropriate unit of prosecution under the Travel Act to be each act of interstate travel or use of interstate or foreign commerce, even if each act is in furtherance of a single unlawful activity. *See United States v. Polizzi*, 500 F.2d 856, 897-98 (9th Cir. 1974) (finding that an indictment that charged defendants with multiple violations of the Travel Act for acts of travel that were in furtherance of same illegal gambling enterprise was not multiplicitous); *United States v. Alsobrook*, 620 F.2d 139, 142 (6th Cir. 1980) (noting that the government could have charged defendant with a separate violation under the Travel Act for each trip in furtherance of a single scheme); *United States v. Brown*, Crim. No. 90-00144-03, 1991 WL 7378, at *2 (E.D. Pa. Jan. 22, 1991) (explaining that "a separate Travel Act violation occurs each time interstate commerce is engaged in or an interstate facility is used, provided the requisite intent is present and an overt act later occurs"); *see also United States v. Douglass*, 780 F.2d 1472, 1478 (9th Cir. 1986) (holding that each crossing of the border could be charged as a separate violation of the Travel Act). The structure of the Travel Act is similar to that of the FCPA – both statutes require that a facility of interstate or foreign commerce be used with the intent to commit a prohibited or unlawful activity. The Travel Act, unlike the FCPA, requires that the defendant

30

perform or attempt to perform the unlawful activity.  However, this performance element does not determine the unit of prosecution, just as the FCPA's requirement that the payment be made for an enumerated purpose and to obtain or retain business does not determine the unit of prosecution.  Both are instead a limiting principal on the type of unlawful activity covered by the statute.

As the statutory language of the FCPA makes clear, each use of the mails or means and instrumentalities of interstate commerce that is *in furtherance of* a promise, offer, or authorization of a payment, is the unit of prosecution.  The Indictment thus charges the Defendants with three separate substantive FCPA counts, based on three separate facilities of interstate commerce, sent on three separate days, each of which meaningfully furthered the $2 million bribe payment authorized by the Defendants.

Based on the foregoing, the Court should deny Coburn's motion to dismiss Counts Two through Four as multiplicitious.[4]

---

[4] Even were Counts Two through Four multiplicitious, the appropriate remedy at this stage in the proceedings would not be dismissal. *See Ball v. United States*, 470 U.S. 856, 865 (1985) (district court may resolve any multiplicity issues after the verdict). Instead, "concerns over multiplicity may be addressed at sentencing." *United States v. Kennedy*, 682 F.3d 244,253 (3d Cir. 2012); *see United States v. Pollen*, 978 F.2d 78, 83 (3d Cir.1992). Hence, "the appropriate curative response would be to merge" any mutiplicitous counts of conviction into a single count of conviction at "sentencing or to dismiss all but one of them prior to sentencing, as opposed to prior to trial." *United States v. Felder*, 2007 WL 172368, at *1 (E.D. Pa. Jan. 11, 2007).

Nor would it be proper to require the Government to elect among Counts Two through Four. "The reasons for requiring the Government to elect among counts in some cases"— "promoting the order and efficiency of the trial and avoiding the risk that the prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several

### III. THE COURT SHOULD DENY COBURN'S MOTION TO DISMISS COUNT TWELVE OF THE INDICTMENT BECAUSE THE FAILURE TO IMPLEMENT AND CIRCUMVENTION OF INTERNAL CONTROLS ARE NOT MUTUALLY EXCLUSIVE, AND REGARDLESS, THE GOVERNMENT IS PERMITTED TO CHARGE MULTIPLE THEORIES OF LIABILITY IN THE CONJUCTIVE IN ONE COUNT OF AN INDICTMENT.

Coburn also seeks dismissal of Count Twelve of the Indictment on the grounds that the charge is "repugnant" because it is "internally inconsistent." (Coburn MTD Br. at 8.)  According to Coburn, he cannot be charged with both a failure to implement a system of internal accounting controls and knowingly circumventing such a system because "if a person has failed to implement a system, there *is* no system, and a person cannot circumvent something that is non-existent." (Coburn MTD Br. at 9-10.)  Coburn's baseless assertion is not grounded in either law or fact. The Court should deny his motion to dismiss Count Twelve.

"Repugnancy in a pleading is an inconsistency or disagreement between statements of material fact." *Cohen v. Wilhelm*, 63 F.2d 543, 545 (3d Cir. 1933). No such disagreement exists here.  In the context of Section 78m(b)(5), failure to

---

crimes"— are not present here. *United States v. Ketchum*, 320 F.2d 3, 8 (2d Cir. 1963) (Friendly, J.) (quotation marks omitted). The specific communications charged in Counts Two through Four all furthered the same scheme. So there is no danger of spillover prejudice or juror confusion from otherwise inadmissible evidence. And any risk of prejudice resulting from the number of counts in the Indictment would be minimized by the Court's standard jury instruction that "[the number of offenses charged is not evidence of guilt, and this should not influence [the jury's] decision in any way." Third Circuit Model Criminal Jury Instruction 3.15.Further, any risk of trial prejudice resulting from the number of counts in the Indictment would be minimized by the Court's standard jury instruction that "[t]he number of offenses charged is not evidence of guilt, and this should not influence [the jury's] decision in any way." Third Circuit Model Criminal Jury Instruction 3.15.

implement and circumvention of internal controls are not mutually exclusive. *See S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 864-65 (S.D. Tx. 2016) (finding that the defendant, the former CFO and current CEO of a company, who both approved improper payments and failed to follow the appropriate internal procedures for approval of those payments could be charged with both failure to implement and circumvention of internal controls).   For example, Section 78m(b)(2)(B) requires that a system of internal accounting controls be implemented that provides "reasonable assurances" that: "(i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."   A defendant may knowingly and willfully fail to implement some internal accounting controls, but not others, and circumvent those other internal accounting controls that are implemented.  Or a defendant may implement all of the internal accounting controls, but not in a way sufficient to provide "reasonable assurances" of the requirements outlined in Section 78m.  That defendant could then, nevertheless, circumvent the insufficient internal accounting controls that were implemented.

Here, Coburn knew of the appropriate internal Cognizant policies that should have been followed with respect to change order requests, and the procedures for approving payments pursuant to change order requests. These policies and procedures included "controls relating to payments and approvals for accounts payable, and controls relating to Cognizant's SEC filings," Indictment ¶ 29(h), which Coburn, as President of Cognizant, was aware of and charged with following.

Coburn's reliance on *U.S. v. Rajarantnam*, No. 13-cr-00211, 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014), is misplaced. There, the defendant contended that multiple counts within an indictment were inconsistent because they charged both the defendant and a co-conspirator with "causing" the purchase of the same set of shares. *Id.* at *6-*7. The court agreed that the counts were inconsistent, because as stated, they alleged that two separate individuals were responsible for causing the purchase of the same securities. *Id.* Here, the Indictment contains no such inconsistency, because Coburn can both fail to implement and circumvent internal controls.

Moreover, separate and apart from the fact that failure to implement and circumvention of internal controls are not mutually exclusive, Coburn's argument is meritless because the Government is permitted to charge multiple theories of liability in the conjunctive in one count of an indictment. It is well settled that a disjunctive statute may be pleaded conjunctively in an indictment and proven disjunctively at trial. *See United States v. Niederberger*, 580 F.2d 63,

68 (3d Cir. 1978).[5]  Indeed, "[w]here there are several ways to violate a criminal statute . . .  federal pleading requires . . . that an indictment charge [be] in the conjunctive to inform the accused fully of the charges."    *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995).  The Government is not required to select one of the alternative means of liability to include in an indictment.  *See United States v. Howard*, 742 F.3d 1334, 1345 n.3 (11th Cir. 2014).  In light of the foregoing, the court should deny Coburn's motion to dismiss Count Twelve of the Indictment.

---

[5] Every federal circuit to consider the issue has come to the same conclusion.  *See, e.g. United States v. Pacchioli*, 718 F.3d 1294, 1300-01 (11th Cir. 2013) (holding that where the government had charged counts in the conjunctive, it only needed to prove "in the disjunctive, one of the three charged acts"); *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012) (noting that it is "hornbook law" that a crime that is disjunctive in the statute "may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive") (internal quotation marks omitted); *United States v. Coughlin*, 610 F.3d 89, 107 n. 10 (D.C. Cir. 2010) (explaining that alternative means of committing a crime should be pleaded in the conjunctive in an indictment); *United States Mejia*, 545 F.3d 179, 207 (2d Cir. 2008) (finding that where a statute can be violated in more than one way, federal pleading requires that indictments be charged in the conjunctive); *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) ("[W]here a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count.") (internal quotation marks omitted); *United States v. McAuliffe*, 490 F.3d 526, 534 (6th Cir. 2007) (same); *United States v. Roy*, 408 F.3d 484, 492 n. 4 (8th Cir. 2005) (same); *United States v. Garcia-Torres*, 341 F.3d 61, 66 (1st Cir. 2003) (same); *United States v. Booth*, 309 F.3d 566, 572 (9th Cir. 2002) (same); *United States v. Mongomery*, 262 F.3d 233, 242 (4th Cir. 2001) (same); *United States v. Dickey*, 102 F.3d 157, 164 n. 8 (5th Cir. 1996) (same).

**IV. THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS BECAUSE THE DETAILED INDICTMENT AND FULSOME DISCOVERY PROVIDE THE DEFENDANTS WITH MORE THAN ENOUGH INFORMATION TO PREPARE THEIR DEFENSE AND AVOID UNFAIR SURPRISE.**

The Defendants have filed motions for a bill of particulars, arguing that despite its length, the Indictment somehow fails to apprise them of facts they must be prepared to defend against at trial. Coburn seeks particulars regarding: (1) the identities of the one or more foreign officials who allegedly received a bribe and the third-party consultants who allegedly paid and facilitated the bribe; (2) the identities of the unindicted co-conspirators and "others" referred to in the Indictment; (3) the underlying factual basis and the theory for how Coburn circumvented or failed to implement internal controls and specification as to whether he did one or the other; (4) the identification of the misrepresentations and omissions alleged in Counts Six, Eight, Ten, and Eleven; (5) the identification of whether Coburn is charged as an accomplice or as a principal, the identities of any alleged principals, and whether references to "Cognizant" denote Cognizant Technology Solutions Corporation or its Indian subsidiary; and (6) the identification of the particular subsection or subsections of 15 U.S.C. § 78dd-1 the Government alleges Coburn violated in Counts Two through Four. (*See* Memorandum of Law in Support of Defendant Gordon J. Coburn's Motion for a Bill of Particulars, Dkt. No. 59-1 (hereinafter "Coburn MBP Br."))

Schwartz requests additional detail concerning: (1) the identities of the co-conspirators; (2) the identities of key unnamed individuals and entities; (3) the places where Schwartz acted and conspired; (4) the identification and details

36

regarding the payments made in furtherance of the alleged bribery scheme; (4) specification of whether Schwartz is alleged to have committed the charge offenses directly, aided or abetted the commission of the offenses, or both; (5) the identification of how the books, records, and accounts that Schwartz falsified or caused to be falsified were false and his alleged role; (6) the identification of how the internal accounting controls allegedly were violated and Schwartz's role in doing so; (7) identification of the purpose for which Schwartz conspired to violate, and violated, the FCPA and his use of interstate commerce; and (8) the identification of the benefits that Schwartz and his co-conspirators received. Many of Schwartz's requests have multiple sub-requests.  (Schwartz Br. at 21-40.)  Each Defendant joined the other Defendant's motion.  In light of the detail in the Indictment itself, as well as the wealth of information available through discovery—including all law enforcement reports of witness interviews conducted by the Government—the Defendants' motions should be denied.

### A.    A Bill of Particulars Is Not Warranted Because The Indictment And Discovery Give Defendants More Than Enough Information About The Charged Crimes.

The Defendants seek far more than the law permits.  They effectively ask the United States to reveal much of its trial strategy and prematurely commit to specific evidentiary proofs.  As Judge Ackerman once explained, Rule 7(f) "does not require the United States Attorney to furnish a three dimensional colored motion picture of the prosecution's proof prior to trial."  *United States v. Caruso*, 948 F. Supp. 382, 395 (D.N.J. 1996) (citations omitted).  Simply put, Defendants' "requests probe too deeply into the Government's theory and method of proof"

and disclosure of such facts "is not necessary to inform the defendants . . . of the nature of the charges against them." *United States v. Mannino*, 480 F. Supp. 1182, 1185 (S.D.N.Y. 1979). Furthermore, most of Defendants' requests are answered by the detailed twenty-four page Indictment, as supplemented by the extensive discovery provided—including courtesy discovery not yet required, such as Jencks Act material. Defendants' requests should thus be denied.

A bill of particulars is required only when an indictment is too vague to permit the defendant to (a) understand the charges and prepare a defense, (b) avoid unfair surprise, and (c) assert a claim of double jeopardy where appropriate. *United States v. Urban*, 404 F.3d 754, 771-72 (3d Cir. 2005). "Only where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,] will we find that a bill of particulars should have been issued." *Id.* (internal citations omitted). As long as the indictment enables the defendant to understand the accusations against him and the central facts that the United States will present at trial, a bill of particulars is unwarranted. *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987); *United States v. Deerfield Specialty Papers, Inc.*, 501 F. Supp. 796, 809-10 (E.D. Pa. 1980).

"A bill of particulars . . . is not intended to provide the defendant with the fruits of the government's investigation, but is instead intended to give the defendant the *minimum* amount of information necessary to permit the defendant to conduct his own defense." *United States v. Mariani*, 90 F. Supp. 2d

38

574, 590-91 (M.D. Pa. 2000) (Vanaskie, C.J.) (emphasis added) (citing *United States v. Smith*, 776 F.2d 1104 (3d Cir. 1985)); *see also United States v. Eufrasio*, 935 F.2d 555, 575 (3d Cir. 1991); *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971). "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory." *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003); *see also United States v. Jabali*, No. 01-cr-801, 2003 WL 22170595, *3 (E.D.N.Y. Sept. 12, 2003) (stating that requests "for exact dates, places, and times in which events occurred . . . ignore the proper scope and function of a bill of particulars and are to be denied").

A bill of particulars is not only unnecessary, it may have a detrimental effect on the Government's proofs at trial. A bill of particulars "effectively narrows the government's case at trial in the same way as the formal charging document: 'there can be no variance between the notice given in a bill of particulars and the evidence at trial.'" *N. Jersey Media Grp. Inc v. United States*, 836 F.3d 421, 429 (3d Cir. 2016) (quoting *Smith*, 776 F.2d at 1111). As a result, district courts are understandably reluctant at the pretrial stage to "unduly freeze [the government] to its proofs at trial." *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del. 1980).

In addition, the Third Circuit has emphasized that a bill of particulars is unnecessary in those cases where, as here, the Government supplements a

detailed charging document with substantial discovery. *Urban*, 404 F.3d at 772; *see also United States v. Munoz*, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs against ordering bill of particulars). Where "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *Caruso*, 948 F. Supp. at 393; *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987) (government's production of 30,000 documents in discovery "must have answered a great many, if not all, of defendants' requests" for discovery and a bill of particulars).

The circumstances of this case obviate the professed need for additional clarity with respect to the allegations in the Indictment. The Indictment provides a wealth of detailed information about the nature of the charged conspiracy and Defendants' specific roles in carrying out its aims. Moreover, discovery in this case has been extensive, and Defendants have had at their disposal evidence that will be used by the Government to prove its case for some time. As explained above, the Government has produced documents —which the Government received from third parties, including email communications, financial and medical records, as well as all law enforcement reports of witness interviews conducted by the Government and the substance of the information we received from counsel concerning employee interviews.

By virtue of this extensive discovery, which goes beyond the scope of Rule 16, *Brady*, or any other applicable authority, Defendants now have material well in excess of "that minimum amount of information necessary" for their "*own*

investigation" such that "there is no need to order the bill of particulars requested by Defendant." *United States v. Grasso*, 173 F. Supp. 2d 353, 367 (E.D. Pa. 2001) (quoting *Smith*, 776 F.2d at 1111).  Ordering a bill of particulars now "would force the Government to a full stop on the continuing factual development of its case." *United States v. Williams*, No. 14-cr-70, 2015 WL 4662706, at *4 (M.D. Pa. Aug. 6, 2015).

Under the foregoing authority, the Indictment, discovery, and additional disclosures here clearly "contain[] sufficient factual and legal information for the defense to prepare its case." *United States v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003); *see also United States v. Atwell*, No. 13-cr-560, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015) (Wolfson, J.) ("discovery, combined with the sufficiency of the allegations contained in the Superseding Indictment, negates the need for a bill of particulars").  Accordingly, Defendants' requests for a bill of particulars should be denied.

### B.     Responses to the Defendants' Requests for Particulars

Though the Government respectfully submits that it is obvious that the individual requests contained in Defendants' motions go far beyond what is required to be disclosed in a bill of particulars, the Government responds below to each one in turn.

### 1.     Requests for the Identification of Unindicted Co-Conspirators and Other Unnamed Individuals

Both Defendants seek the identity of all unindicted co-conspirators and "others" referenced in the Indictment.  (Schwartz Br. at 22, Coburn MBP Br. at 10.)   Schwartz's request is even broader, encompassing "any other co-

conspirators, participants, and 'others,' with whom [he] allegedly conspired or acted, whether they are referenced in the indictment or not."  (Schwartz Br. at 24.)  The Court should deny these requests.

"Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved."  *United States v. Ligambi*, No. 09-cr-496, 2012 WL 2362638, at *4 (E.D. Pa. June 21, 2012) (internal citations and quotation marks omitted); *see also United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004) ("[T]he Government is not required to furnish the name of all other co-conspirators in a bill of particulars."); *United States v. Needham*, No. 04-cr-196, 2004 WL 1903061, at *3 (S.D.N.Y. Aug. 26, 2004) (observing that courts in the Second Circuit have been "highly reluctant" to require a bill of particulars seeking specific identities of co-conspirators).  A bill of particulars identifying uncharged individuals is particularly inappropriate where, as here, the Indictment contains detailed allegations about the conspiracy and the Government has produced comprehensive discovery.  *See United States v. Torres,* 901 F.2d 205, 233-34 (2d Cir. 1990) (affirming denial of a bill of particulars where there was "a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits"); *United States v. Rodriguez,* No. 99-cr-367, 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators because the indictment coupled with discovery permitted the defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

42

The Indictment in this case references three specific uncharged co-conspirators defined as "CC#1," "CC#2," and "CC#3."  Even though the discovery produced makes clear the identities of these three individuals, the Government recently confirmed their identities in a separate discovery letter to the defense. That letter also confirmed the identities of the "Construction Company" and the "Development Authority," as referenced in the Indictment.  Accordingly, those aspects of the Defendants' motions are moot.

The Defendants' remaining requests for the identities of all other uncharged co-conspirators and "others" referenced in the Indictment should be denied.  As noted, the Government's discovery productions include all of the FBI 302s from the Government's witness interviews and all emails involving those witnesses in the Government's possession.  As a result, the Defendants have all of the information necessary to understand the charges against them (including the identity of any potential co-conspirators beyond CC#1 through CC#3), prepare a defense, avoid any unfair surprise at trial, and conduct their "own investigation."  *Smith*, 776 F.2d at 1111.[6]  Under these circumstances, the Defendants' requests cannot credibly be presented as legitimate efforts to learn the nature of the charges and prepare for trial.  Instead, they are an effort to gain an unfair tactical advantage at trial by obtaining a premature list of the Government's trial witnesses and a preview of the Government's trial strategy, as well as to limit the Government's trial evidence – none of which is required by

---

[6]    Of course, any potential co-conspirators not identified in these documents would also be unknown to the Government at this time.

the Rules of Criminal Procedure, this Court's Scheduling Orders, or any other authority.

Similarly, the Defendants' broad requests for particulars concerning all "others" referenced in the Indictment are meritless.  (Schwartz Br. at 22-23; Coburn MBP Br. at 11-12.)   The Government often includes "others" in conspiracy indictments because a prosecution is not a static enterprise and the Government occasionally develops evidence about co-conspirators in the run-up to trial.  Ordering a bill of particulars now "would force the Government to a full stop on the continuing factual development of its case," including with respect to the defendants' alleged co-conspirators.  *United States v. Williams*, Crim. No. 14-70, 2015 WL 4662706, at *4 (M.D. Pa. Aug. 6, 2015).

The cases the Defendants cite in which the Government was ordered to provide a bill of particulars identifying uncharged co-conspirators are against the weight of authority, or are distinguishable.  For instance, while the court in *United States v. Vastola*, 670 F. Supp. 1244, 1269-70 (D.N.J. 1987), cited by both Defendants (Coburn MBP Br. at 14; Schwartz Br. at 23, 26), ordered the Government to provide a bill of particulars identifying "the names of all co-conspirators or participants in the alleged offenses[,]" that case involved complex RICO and organized crime offenses of an entirely different magnitude and scope than those at issue here: the indictment in that case included 114 counts naming 21 defendants, and the alleged criminal conduct spread across numerous categories of illegal activity, including narcotics, extortion, mail and wire fraud, copyright fraud, insurance fraud, bankruptcy fraud, gambling, and

44

firearms.  *Id.* at 1251-52.  For similar reasons, *United States v. Gatto,* 746 F. Supp. 432, 477 (D.N.J. 1990), *rev'd on other grounds,* 924 F.2d 491 (3d Cir. 1991), cited by the Defendants, is equally inapplicable.  That case also involved multiple defendants, complex RICO charges, and numerous categories of alleged criminal activity.  *Id.* at 439-45.  The sheer volume of counts, legal theories, and categories of criminal conduct at issue in *Vastola* and *Gatto* are completely different from this case, which alleges a single bribery scheme against two defendants.

Judge Hochberg observed the unique nature and limited application of *Vastola* and *Gatto* in denying a similar request for a bill of particulars in *United States v. Wolff*, No. 11-cr-719, 2013 WL 646204 (D.N.J Feb 20, 2013), a case involving a scheme to defraud the government through false and inflated billing by the former chief executive officer of an engineering consulting firm that had a contract with a federal government agency.  There, the court refused to follow *Vastola* and *Gatto* given the unique circumstances of those cases, and found that, "[e]xamined in its entirety, the information provided to Defendant in the Indictment and through discovery is sufficient to allow him to prepare his defense."  *Id.* at 3.[7]

---

[7]  The other cases the Defendants cite in which courts required the Government to identify uncharged co-conspirators or other individuals are equally unpersuasive and distinguishable because, unlike this matter, those cases involved either vague indictments with limited details, highly complex indictments against multiple defendants (mostly RICO cases) that made it difficult to understand the nature of the charges and the identity of the co-conspirators, or the absence of other fulsome disclosures of information by the government.  (Schwartz Br. at 22-23; Coburn MBP Br. at 11-13).  *See United*

_____

*States v. Redding*, 540 F. Supp. 2d 1184, 1188 (D. Kan. 2008) (requiring government to identify co-conspirators or point defendant to identifying information in discovery where the indictment was only two pages and did not identify any co-conspirators); *United States v. Nachamie*, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000) (Medicare fraud case where indictment charged eight defendants with a conspiracy that spanned more than three years and involved approximately 2000 Medicare claims, and the government produced voluminous discovery but "failed to give defendants adequate notice of the particular charges against them"); *United States v. Mariani*, 90 F. Supp. 2d 574, 592 (M.D. Pa. 2000) (fraud based on misrepresentations to government agencies about waste received by a landfill; time period covered in the indictment was seven years, and the indictment referred vaguely to three broad categories of potential co-conspirators and scheme participants: "unnamed weighmasters" the "accounting department," and "upper management."); *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (see description *infra*, page 65); *United States v. Wilson*, No. 95-cr-668, 1997 WL 10035, at *2 (S.D.N.Y. Jan. 10, 1997) (RICO case involving multiple defendants engaged in conduct occurring over a twenty-year period; court did not require Government to disclose names of uncharged co-conspirators until seven weeks prior to trial); *United States v. Ramirez*, 602 F. Supp. 783, 793 (S.D.N.Y. 1985) (drug case in which none of the overt acts in the indictment mentioned the movant defendant and he was "mentioned only as one of ten co-conspirators charged"; motion for bill of particulars was made on the "eve of trial"); *United States v. Failla*, No. 93-cr-294, 1993 WL 547419, at *7 (E.D.N.Y. Dec 21, 1993) (RICO case against six alleged members of Gambino crime family in which indictment alleged "a variety of different conspiracies both separately and as racketeering acts"); *United States v. Ahmad*, 53 F.R.D. 194, 199 (M.D. Pa. 1971) (indictment charged eight defendants with various categories of offenses including conspiracy to destroy selective service property, causing a postal office to deliver a letter containing threats to a presidential advisor, and sending communications to and from a federal prison in violation of prison rules); *United States v. Falkowitz*, 214 F. Supp. 2d 365, 391-92 (S.D.N.Y. 2002) (insurance fraud case involving a conspiracy that spanned over four years, was "wide ranging," and involved a "large number of co-conspirators" as indicated by an affidavit filed in the case); and *United States v. Lino*, No. 00-cr-632, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (RICO indictment naming twenty-three defendants in twenty-six counts arising from multiple fraud and bribery schemes; court noted that identity of uncharged co-conspirators was necessary due to "large number of defendants," and "wide-ranging" nature of crimes "in terms of the nature of the predicate acts and the amount of commerce affected[.]").

The Government has provided the Defendants with more than a sufficient amount of information about the charges in the Indictment and participants of the bribery scheme.  No additional detail is necessary.[8]

### 2. Requests for Identification of Foreign Government Officials and Third-Party Consultants

The Defendants seek the identities of the foreign government official(s), the third-party consultant referenced in the Indictment, and any other intermediaries involved in paying the alleged bribes.  (Schwartz Br. at 24-26; Coburn MBP Br. at 6-10.)  The Court should deny these motions because they demand information that the Government need not prove at trial and that it

---

[8] Coburn also requests that, if the Court denies his motion for a bill of particulars, the Court strike from the Indictment the term "others" as surplusage.  The Court should deny Coburn's request.  A court should grant a motion to strike only if the defendant demonstrates that the language in the Indictment is "both irrelevant (or immaterial) and prejudicial." *United States v. Hedgepeth,* 434 F.3d 609, 612 (3d Cir.2006).  "This is 'an exacting standard which is met in only rare cases.'" *United States v. Holzwanger,* No. 10-cr-714, 2011 WL 1741920, at *7 (D.N.J. May 4, 2011) (quoting *United States v. Eisenberg,* 773 F. Supp. 662, 700 (D.N.J.1991)).  Coburn has not met this standard.  As an initial matter, his reliance on *United States v. Alsugair,* 256 F. Supp. 2d 306, 317 (D.N.J. 2003), *Gatto,* 746 F. Supp. at 455-58, and *Vastola,* 670 F. Supp. at 1256-57, for the proposition that the term "others" could be prejudicial by implying criminal conduct beyond that charged in the indictment is misplaced because those cases applied an outdated disjunctive standard that allowed language to be struck if it was immaterial "or" prejudicial.  The Third Circuit replaced that standard in *Hedgepeth* by clarifying that the language at issue must be both irrelevant and prejudicial.  *See United States v. Stock,* No. No. 11-cr-182, 2012 WL 202761, at *13 (W.D. Pa. Jan. 23, 2012) (noting that "*Alsugair* no longer remains good law in light of … *Hedgepeth.*").  The term "others" in the Indictment is not immaterial as it clarifies that the Defendants did not act in isolation in carrying out the scheme, and it is not unduly prejudicial as the trial evidence will demonstrate the precise scope of the scheme and its participants.  Nonetheless, if the Court later decides that the trial evidence does not support the use of the term "others" in the indictment, and the Court elects to provide the jury with the Indictment or to read it to them, the Court can revisit this issue prior to doing so.

presently lacks, in any event.  As explained below, the charges in the Indictment do not require the Government to prove the precise identity of the foreign officials or the details of the bribe payments.  Since those details will not be part of the Government's case at trial based on the evidence currently in the Government's possession, and are not required under the plain language of the FCPA or the case law, the Defendants' assertions that they cannot adequately prepare ring hollow.

The Indictment alleges, among other things, that the Defendants authorized the Construction Company to pay a bribe to one or more foreign government officials to obtain the Planning Permit for the KITS Project, and that they took various steps in furtherance of that scheme.  The Indictment does *not* allege that the Defendants knew the identity of the foreign government officials, the third-party consultant, any other intermediaries that may have facilitated the bribe payments, or any details concerning the actual bribe payments to foreign officials.  None of those allegations (or evidence to prove them) are necessary under the law.

The FCPA prohibits, among other things, certain categories of individuals and entities from offering, paying, promising to pay, or authorizing the payment of bribes to foreign officials for certain purposes identified in the statute.  15 U.S.C. § 78dd-1(a).  This prohibition applies to payments (or promises or authorizations of payments) to "any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or

48

indirectly, to any foreign official, to any foreign political party or official thereof."
15 U.S.C. § 78dd-1(a)(3).

"By its plain terms, '[t]he language of the statute does not appear to require that the identity of the foreign official involved be pled with specificity.'" *S.E.C. v. Straub*, 921 F. Supp. 2d. 244, 265 (S.D.N.Y. 2013) (quoting *Jackson,* 908 F. Supp. 2d at 849). Any such requirement "would be at odds with the statutory scheme, which targets actions (such as making an 'offer' or 'promise') without requiring that the 'foreign official' accept the offer or reveal his specific identity to the payor." *Id.* (citing 15 U.S.C. § 78dd–1(a)). Indeed, "the fact that the FCPA prohibits using 'any person' or an intermediary to facilitate the bribe to any 'foreign official' or 'any foreign political party' suggests that the statute contemplates situations in which the payor knows that a 'foreign official' will ultimately receive a bribe but only the intermediary knows the foreign official's specific identity." *Id.* (citing 15 U.S.C. § 78dd–1(a)(1)–(3)).

In *Straub*, the court denied a motion to dismiss the SEC's complaint in an FCPA enforcement action, rejecting the defendant's argument that the complaint was deficient for not alleging sufficient facts to establish that the intended bribe recipients were foreign officials under the FCPA. 921 F. Supp. 2d. at 265.[9] The

---

[9] The Government recognizes that *Straub* is a civil case that did not implicate Federal Rule of Criminal Procedure 7's pleading requirements or the constitutional protections that flow to criminal defendants facing federal felony charges. That said, *Straub's* analysis is rooted in the statutory scheme of the FCPA, not nuances of civil procedure. And *Straub's* holding that the FCPA does not require the government to identify the foreign official applies with equal force and persuasiveness in this case. The same holds true for *Jackson*, discussed below.

court determined that the FCPA contains "no requirement that the 'foreign official' be specifically named" and that "reading such a requirement into the FCPA would be contrary to the statutory scheme." *Id.*

*Straub* is not an outlier. The same rationale and statutory interpretation governed the court's decision in *Jackson*, which rejected similar defense arguments attacking an SEC complaint that failed to identify the foreign official who received the alleged bribe payments. There, the court reasoned:

> [I]t would be perverse to read into the statute a requirement that a defendant know precisely which government official, or which level of government official, would be targeted by his agent; a defendant could simply avoid liability by ensuring that his agent never told him which official was being targeted and what precise action the official took in exchange for the bribe.

*Jackson,* 908 F. Supp. 2d at 850. *See Id.* ("The Court seriously doubts that Congress intended to hold an individual liable under [the FCPA] only if he took great care to know exactly whom his agents would be bribing and what precise steps that official would be taking.").

Here, the Indictment sufficiently alleges that the Defendants authorized a bribe payment to a foreign official to secure and obtain the Planning Permit for the KITS Campus project. The evidence at trial will demonstrate that the Defendants and their co-conspirators understood that the intended recipient of the bribe payment was a government official or officials in India with oversight and/or influence over the issuance of the Planning Permit. That is enough to satisfy the FCPA's requirement of a "foreign official," which is broadly defined to include "any officer or employee of a foreign government or any department, agency, or instrumentality thereof," or "any person acting in an official capacity

for or on behalf of any such government or department, agency, or instrumentality[.]"  15 U.S.C. § 78dd-1(f)(1)(A).

Beyond that, there simply is no additional information to give the Defendants.  Based on the detail in the Indictment and the detail included within the discovery, the Defendants have the information the Government has concerning the bribe payments, participants, and details.    Because the Government at this point does not possess evidence sufficient to identify the specific foreign official or the third-party consultant involved in the bribe payment, and because such evidence is not necessary to prove an FCPA bribery offense, the Defendants do not require these particulars to prepare for trial, or, as Coburn suggests, to retain an expert to opine on "India's government and bureaucracy."  (Coburn MTD Br. at 7.)

The two district court orders Coburn cites – *United States v. Carson*, No. 09-cr-00077 (C.D. Cal. May 18, 2009), ECF 75, and *United States v. Nguyen*, No. 08-cr-00522 (E.D. Pa. Oct. 16, 2009), ECF No. 95 – do not support a different result.  Neither case held that the Government was required to prove the identity of the official.  Rather, both cases, albeit FCPA cases, are irrelevant because in those cases, the Government knew the identities of the foreign officials and it appears the only issue was whether and when the Government should be required to disclose them.  That is not the case here.  If the Government possessed that information, it would have been included in the voluminous discovery provided to the defense to date.  For the same reasons, the domestic bribery cases Coburn cites do not advance his position (Coburn MBP Br. at 9),

and, in any event, various courts in domestic bribery cases also have denied similar defense motions relating to the identity of bribe recipients.  *See United States v. Jennings,* 471 F.2d 1310, 1311–12 (2d Cir.1973) (in federal bribery case, trial court correctly denied an instruction requiring the government to show the defendant knew that the officials at issue were FBI agents); *Castro v. United States,* 248 F. Supp. 2d 1170, 1183–1184 (S.D. Fla. 2003) (in case charging 18 U.S.C. § 666, "the government was not required to prove the identity of the [county] agent whom Movant intended to influence.").

Accordingly, the Court should deny the Defendants' requests for particulars relating to the identity of the foreign officials referenced in the indictment, the third-party consultant, and any other individuals or entities potentially involved in the bribe payments.

### 3.   Request for Details Regarding Payments Made in Furtherance of the Bribery Scheme

The Defendants next seek a broad range of details regarding payments made in furtherance of the bribery scheme.  Specifically, Schwartz requests particulars regarding the falsified change orders through which Cognizant reimbursed the Construction Company for the bribe payment, including, "a description and the amount of each specific expense related to the alleged fraudulent reimbursement" and "the specific change order and variation requests the government alleges were falsified in order to conceal the reimbursement … as well as the identities of the individuals who allegedly falsified these documents and the dates on which they did so." (Schwartz Br. at 29-30.)  The Defendants also seek particulars regarding whether a bribe in fact

52

was paid, and the specific details of any payments Cognizant made to the Construction Company as reimbursement for the bribe. (*Id.*). To the extent the Government possesses any of this information, the Defendants already have it through the detailed Indictment and the expansive discovery productions. Accordingly, a bill of particulars is not appropriate.

As noted, the documents produced in discovery include the email correspondence, spreadsheets, and payment information relating to the Construction Company's change order requests. This information was produced electronically, in searchable format compatible with standard electronic discovery review platforms. Contrary to Schwartz's assertions, the defense is not left to guesswork in determining which of these documents are relevant to the bribery scheme. That is because the Indictment (coupled with the detailed FBI 302s, emails, and other documents) provides key information necessary to navigate the discovery. For instance, the Indictment alleges: that the change order process began in late 2014 (Indictment, ¶ 22); the Construction Company "submitted a list of approximately forty-five claims totaling approximately $25 million" (*Id.*); the "Construction Company included in its claims list an approximately $3.7 million claim for 'approvals/campus regularization,' which included an approximately $2.5 million request for 'statutory approvals – planning permit'" (*Id.* at ¶ 23); "CC#1 instructed a co-conspirator who was a member of Cognizant's real estate group to create a fake version of the claims list – one that replaced the $3.7 million 'approvals/campus regularization' request with eleven previously-rejected claims worth roughly the same amount"

(*Id.* at ¶ 24); and Cognizant issued several separate payments to the Construction Company between March 2015 and January 2016 to cover the change orders, including the bribe reimbursement (*Id.* at ¶ 26). Notably, certain of the FBI 302s provide extensive detail on the change order process, the individuals involved, and the relevant documents, as expressly referenced in the 302s by bates numbers.[10]

Beyond these detailed disclosures, the Defendants are not entitled to a forensic accounting by the Government or a roadmap of its trial presentation. Because the Defendants' motion seeks "exact dates, places, and times in which events occurred[,]" they "ignore the proper scope and function of a bill of particulars and are to be denied." *Jabali*, 2003 WL 22170595, *3.

---

[10] The defendants cite *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d. 941 (N.D. Ill. 2001), a health care fraud case that involved hundreds of thousands of dollars in fraudulent bills to insurance companies. Despite voluminous discovery productions by the government, including witness statements, the court in that case ordered a bill of particulars setting forth the identity of the patient-victims of the alleged offenses, the records claimed to include false entries, and any allegedly fraudulent bills to insurers. *Id.* at 943. It is unclear, however, whether the documents and witness statements the government produced provided the requested information, as it largely does in this case. Further, *Vasquez-Ruiz* relies heavily on the Second Circuit's decision in *United States v. Bortnovsky,* 820 F.2d 572 (2d Cir.1987), an insurance fraud case involving false claims for burglary losses and fire damages. *Id.* at 943-44. There, unlike this matter, the government produced "mountains of documents" but left the defendants "unguided as to which documents would be proven falsified[.]" *Bortnovsky*, 820 F.2d at 575. That simply is not the case here; as noted, the detailed 302s include express references to specific documents by bates number, and the change order documents were exchanged during a defined period of time and account for a limited fraction of the Government's overall document production. There can be no credible argument that the defendants have been left "unguided" or to their "own devices" in reviewing these materials and preparing their defenses. *Vasquez-Ruiz*, 136 F. Supp. 2d at 943; *Bortnovsky*, 820 F.2d at 575.

Nonetheless, the Defendants argue that courts "routinely" require the government to disclose the kind of information they seek in cases "based upon monetary payments" (Schwartz Br. at 28.)   However, the cases they cite are inapposite.  Specifically, *Wilson*, a RICO case alleging extortion, bribery and other predicate acts, involved several substantive charges that were based on specific bribe payments.  (Schwartz Br. at 28), 1997 WL 10035, at *2.  The court noted that three counts of the indictment "aggregate payments alleged to have been received by the defendants named in those counts" and that "particulars [were] warranted by reason of such aggregation."  *Id.  United States v. McGuiness*, also cited by the Defendants (Schwartz Br. at 29), presented similar circumstances. 764 F. Supp. 888, 892 (S.D.N.Y. 1991) ("The various payments aggregated in each of Counts Two through Five point to a continuous course of conduct, involving the same employer and the same underlying agreement to accept payments in exchange for favorable treatment in the assignment of workers."). The Indictment in this case, in contrast, does not charge as separate offenses any of the payments from Cognizant to the Construction Company, let alone aggregate payments.

Based on the detailed Indictment and discovery disclosures to date, the defendants are not entitled to particulars regarding the payments alleged in the Indictment.

### 4.    Request for Identification of Places Where Defendant Schwartz Acted and Conspired

Defendant Schwartz seeks the identification of "the locations of relevant acts alleged in the Indictment" due to the "Indictment's allegations of conduct

that occurred 'elsewhere.'" (Schwartz Br. at 26.)  This request is beyond the scope of a bill of particulars and should be denied.  *See United States v. Jones*, 447 F. App'x 319, 323 (3d Cir. 2011) (no error where district court denied request for bill of particulars specifying locations of drug sales); *Jabali*, 2003 WL 22170595 at *3 (stating that requests "for exact dates, places, and times in which events occurred . . . ignore the proper scope and function of a bill of particulars and are to be denied").  In support of his request, Defendant Schwartz again relies on *Gatto* and *Vastola*, which are readily distinguishable from this case, as discuss above.  *See* IV.B.1 at 44-45; *Wolff*, 2013 WL 646204 at *3 (observing the unique nature and limited application of *Vastola* and *Gatto* in denying a similar request for a bill of particulars).[11]

The detailed nature of the Indictment and the extensive discovery here provide the Defendants with sufficient evidence to conduct their own investigation and adequately prepare their defenses.  *See* IV.A.  At trial, and consistent with allegations in the Indictment, the Government will introduce proof sufficient to establish venue in the District of New Jersey.

### 5.    Requests for Details Relating to Aiding and Abetting

Both Defendants argue in their respective motions for bills of particulars that the Government should specify whether they are being charged with committing the offenses directly, or whether they are being charged with aiding or abetting the alleged criminal offenses.  (Coburn MBP Br. at 30; Schwartz Br.

---

[11] Defendant Schwartz also cites *United States v. Holman*, 490 F. Supp. 755, 762 (E.D. Pa. 1980) in support of his request, but it is equally unpersuasive, as it involved twelve defendants and a complex heroin distribution conspiracy.

at 20.)  Both Defendants also seek the names of the principals alleged to have committed the charged offenses in the event that they are being charged under an aiding or abetting theory.  *Id.*  They also both cite to the Second Circuit's decision in *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018) as further support for their requests on the basis that if the principal offender could not be charged under the FCPA, they cannot be charged under an aiding and abetting theory for violations for the FCPA.  (Coburn MBP at 31-32; Schwartz MTD at 22-23.)  Schwartz additionally demands that the Government specify whether references to "Cognizant" in the Indictment refer to CTS or Cognizant India.  Schwartz Br, at 24-25.  Both Defendants' demands for particulars are baseless, unsupported by law, and should be denied.

The Government is not required to specify for Coburn and Schwartz whether they are charged as principals or under an aiding and abetting theory.  Nor is the Government required to disclose the names of the principals alleged to have committed the charged offenses to the extent that the Defendants are being charged under an aiding and abetting theory.  Requiring the Government to disclose either amounts to requiring the Government to reveal its "theory underlying those counts of the indictment."  *United States v. Mannino*, 480 F. Supp. 1182, 1185 (S.D.N.Y. 1979) (holding that the government was not required to specify in a bill of particulars whether the defendants were being charged as principals or under an aiding and abetting theory, or specify which acts were committed by aiders or abettors).  Such information falls far outside of the types of information that a defendant may seek pursuant to a bill of particulars, as

"the law does not impose upon the Government an obligation to preview its case or expose its legal theory." *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977).

The cases cited by the Defendants in support of their requests are distinguishable or inapposite. Many of the cases they cite are cases charged under the RICO statute, for which courts have held that there is special concern for particularization because of the nature of the charge. *See United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) ("These principles [regarding a bill of particulars] must be applied with some care when the Government charges criminal offenses under statutes as broad as RICO. With the wide latitude accorded the prosecution to frame a charge that the defendant has 'conspired' to promote the affairs or an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope.").

For example, *United States v. Green*, No. 92-cr-159, 1993 WL 652793 (W.D.N.Y. Sept. 21, 1993), which is cited by both Defendants, involved a RICO conspiracy charging 29 defendants with various racketeering and narcotics offenses in over 70 counts. The court noted that its decision with respect to the defendants' various requests was animated by the concern expressed in *Davidoff* that there is a "special concern for particularization" in RICO cases. *Id.* at *3. The *Green* court thus granted defendants' requests for information as to whether each defendant was charged as an aider and abettor, again referencing the particulars of the case at hand, the "lack of detail" in those counts of the

58

indictment, and the fact that the defendants would need more than the hundreds of hours of tape-recorded conversation to prepare for trial.  *Id.* at 7-8.  Similarly, in *United States v. Eldridge*, No. 09-329A, 2010 WL 3749060 (W.D.N.Y. Sept. 20, 2010), another RICO case, the court denied the vast majority of the defendants' requests for particulars and granted a request for whether the defendant was being charged as a principal or an accomplice only with respect to one defendant in one charged gun possession count.  *See also United States v. Failla*, No. CR-93-00294, 1993 WL 547419 (E.D.N.Y. Dec. 21, 1993) (granting a request for a bill of particulars to provide whether the defendants were being charged as principals or aiders and abettors in a RICO conspiracy case with six defendants).

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987), the lone non-RICO case cited by the Defendants, is likewise unhelpful.  *Feola* involved a drug trafficking conspiracy resulting from an investigation involving 11 separate wiretap orders.  *Id.* at 1080-1087.  The court noted, in making the decision to grant *one* defendant's motion for a bill of particulars regarding whether he was being charged as a principal or an aider or abettor, that other courts had denied similar requests for information because doing so would require the government to disclose its theory of the case.  *Id.* at 1133.  The *Feola* court's decision to the contrary was entirely fact specific and based on the discovery in that case, which, like the discovery in *Green*, involved hundreds of hours of tape recorded conversations.  *Id.* at 1146.

Nor does the Second Circuit's decision in *Hoskins*, 902 F.3d 69, 84 (2d Cir. 2018) support the Defendants' requests.  Lawrence Hoskins was charged with

conspiracy to violate the FCPA and substantive violations of the FCPA for his role in a scheme in which several defendants were alleged to have conspired to pay bribes to Indonesian government officials to ensure that Alstom S.A., a company headquartered in France, was awarded a contract from the Indonesian government.  902 F.3d at 72.  During the time that the bribery scheme was ongoing, Hoskins was a national of the United Kingdom and was employed by Alstom's United Kingdom subsidiary; he worked in France and did not travel to the United States.  *Id.*  In deciding which category of persons were covered by the FCPA, the *Hoskins* court held that the FCPA did not cover "nonresident foreign nationals outside American territory without an agency relationship with a U.S. person, and who are not officers, directors, employees, or stockholders of American companies."  *Id.* at 84-97.

In making their argument, however, Defendants fail to acknowledge that they are themselves covered by the statute, and that they conspired with individuals who are covered by the statute.  According to the Second Circuit, Hoskins was not covered by the statute, thus he could only be charged with a conspiracy to violate the FCPA if he acted as an "agent of a domestic concern liable as a principal" for the violations.  *Id.* at 97-98.  Count One of the Indictment charges both Defendants with conspiring to violate the FCPA as officers, directors, employees, or agents of an issuer, in this case, Cognizant Technology Solutions, a United States issuer.  Regardless of whether both Defendants are being charged as a principal or an accomplice in Count One, they acted with other individuals covered by the statute (each other, CC#1, CC#2, among others),

and thus can be charged in the conspiracy.  With respect to Counts Two through Four, Defendants also ignore the additional individuals who are named in the "Means and Instrumentalities of Interstate and International Commerce" column with respect to those counts.  All of those individuals could be charged under the FCPA as principals.  With respect to Counts Five through Eleven, both Defendants are charged in individual counts with violations of the books and records provisions of the FCPA with respect to various documents that each signed, approved, or had some role in creating the final product.  All of those documents relate to filings made by their employer, which is an issuer covered by Section 78dd-1.  Finally, with respect to Count Twelve, both Defendants are charged with failing to implement, and circumventing, Cognizant's (their employer's) internal controls, either directly and indirectly.  The holding in *Hoskins* has no applicability to those counts.

Finally, the Government should not be required to identify in a bill of particulars whether references to "Cognizant" in the indictment refer to Cognizant Technology Solutions Corporation or its wholly-owned subsidiary, Cognizant Technology Solutions India Private Limited, as both are covered by the FCPA.  Indeed, the Indictment alleges that Cognizant was an "issuer" under the FCPA, and Cognizant Technology Solutions India Private Limited was an agent of an issuer.  (Indictment, ¶¶ 1(a)(b).)  No additional information is warranted.

### 6.     Requests for Detail Regarding Specific Misstatements

Defendants next seek information related to the specific misstatements they are alleged to have made with respect to Counts Six through Eleven in the

61

indictment. Specifically, Coburn seeks further detail regarding which misstatements or omission are at issue in the two Sarbanes-Oxley Quarterly Global 302 Certifications and two Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaires. (Coburn MBP Br. at 19.) Schwartz's request is even broader; he seeks specific misstatements in the Cognizant's filings with the SEC, not just the alleged misstatements that Schwartz is alleged to have made in the documents he signed or certified himself. With respect to Count One, Schwartz requests particulars regarding "the ways in which Cognizant's Annual Report on Form 10-K [for 2014 and 2015] were false" to the extent not already specified in the Indictment, Schwartz's role in the falsification, and information regarding specific books, records, and accounts that were false. (Schwartz Br. at 34-35.) For Count Seven, Schwartz requests information regarding the ways in which the Sarbanes-Oxley Global Quarterly 302 Certification, not just his own certification, was false and his role in the falsification. Finally, for Count Nine, Schwartz requests details about how the Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaire for 2014 was false and his role in the falsification. (*Id.* at 35.) The Defendants already have this information through the expansive discovery provided by the Government, and in the Indictment itself. Accordingly, their request should be denied.

As an initial matter, Counts Seven and Nine incorporate by reference the preceding paragraphs of the Indictment, which lay out in great detail the conspiracy in which the Defendants participated. The documents provided in

discovery include each of the documents on which the Defendants are alleged to have made the misleading representations and omissions arising out of the conspiracy.  These documents are questionnaires and certifications that each Defendant had to respond to and certify as part of their responsibilities as officers and directors at Cognizant.  The questionnaires vary in length from two pages to twenty pages, and contain a series of yes or no questions, where further explanation is only required if the answer to a particular question is "yes."  The Sarbanes Oxley Quarterly Global 302 Certifications that are at issue in Counts Six through Eight are each two pages long and contain seven questions, each of which both Defendants answered with a "yes" and then certified.  The Annual Report on Form 10-K and Proxy Statement Disclosure Questionnaires at issue in Counts Nine through Eleven include biographical information, a series of yes or no questions (including questions related to bribes paid in other countries), a section on investments and other conflicts of interests, and other miscellaneous questions.

As Schwartz acknowledges in his motion, the Indictment provides sufficient detail about the alleged misrepresentations and omissions in the documents at issue in Count One and Counts Six through Eleven.  For instance, the Indictment alleges that both Defendants made "false, fraudulent, and misleading representations and omissions" in the Sarbanes-Oxley Quarterly Global 302 Certifications, including "falsely certifying that Cognizant's internal controls has been in force and effective, and that they had disclosed to Cognizant's Chief Executive Officer and Chief Financial Officer all known

63

deficiencies in the operation of the internal controls and any known fraud involving management or other employees who had a significant role in Cognizant's internal controls." (Indictment ¶ 29(g)(ii).) The Indictment also explains that with respect to the Annual Report on Form 10-K Questionnaires, the Defendants made or caused "false, fraudulent, and misleading representations and omissions" including "providing false answers to questions relating to: bribes or kickbacks; disguised or intentionally misrecorded entries in Cognizant's books and records; and transactions that may have violated Cognizant's Code of Conduct." (*Id.* at ¶ 29(g)(iii).)

Defendants are not entitled to a detailed account of how the Government will prove its case at trial. The Government is not required, through a bill of particulars, to "identify every omission or inclusion rendered by the false documents identified in the indictment," *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012), because doing so would "weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants," *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971) (citations omitted).

Despite this, Defendants argue that they are entitled to this information. However, the cases they cite are distinguishable and inapposite. *United States v. Schiff* involved false statements and omissions by an employee of a pharmaceutical company in analyst calls and in filings with the SEC. (Schwartz Br. at 33), 538 F. Supp. 2d 818 (D.N.J. 2008). The opinion references an earlier order issued by the court requiring that the Government provide defendant with

particulars relating to specific statements or omissions made on the calls and in filings.  The Government provided defendant with a bill of particulars with over 100 misstatements and omissions in analyst calls (in 14 single-spaced pages) and identified omissions in SEC filings.  538 F. Supp. 2d at 825.  The scope of the particulars provided by the Government in *Schiff* makes clear that the allegations at issue there were far broader than those at issue in the instant matter, and that they involved a far broader set of communications from which they could be drawn.

*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998), which Coburn cites, is also distinguishable.  That case involved a campaign contributor who allegedly conspired against the United States by impairing the lawful functions of the Federal Election Commission ("FEC"), as well as with aiding and abetting in the making of false statements to a government agency, by making false statements to a political party that were then including in filings by the political party to the FEC.  21 F. Supp. 2d at 13.  The Government had provided the defendant with 45 pages of excerpts from documents in which the allegedly false statements were included, but the court granted the defendant's motion for a bill of particulars with respect to the false statements charged in the indictment.  *Id.* at 21.  The court found the 45 pages of disclosures insufficient because they contained 175 names and information about each person or entity listed, which did not give the defendants much guidance as to the misstatements or omissions they were charged with having made.  *Id.*  The misstatements and omissions at issue here, and the documents in which they are contained, are in no way similar

65

to those addressed in *Trie*.  As noted above, the Government has provided both Defendants with the questionnaires in which they are alleged to have made false statements or material omissions.   Under these circumstances, a bill of particulars is not warranted.[12]

Cases from this Circuit are directly contrary to the Defendants requests for further particulars related to misrepresentations and omissions.  In *Moyer*, 674 F.3d 192, the Third Circuit ruled that the district court's denial of a motion

---

[12] *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), which is also cited by the Defendants,  involved a defendant who was charged with making false statements to the FEC in connection with a scheme to obtain illegal campaign donations from foreign donors, and is also distinguishable.  The alleged false statements in *Hsia* were made in reports filed with the FEC, and the government had provided information about the false names that were reported as having made donations.  24 F. Supp. 2d at 32.  The court, however, required the government to provide particulars about how the defendant had "caused" the false statements.  *Id.*  The reports at issue, like those in *Trie*, and unlike the questionnaires here, were actually filed by the political committees, and not by the defendant herself.  Thus, the court held that particulars about how the defendant caused those false statements was appropriate.

Likewise, *United States v. Rogers*, 617 F. Supp. 1024 (D. Colo. 1985), is inapposite.  *Rogers* involved an indictment that charged four defendants in thirty counts, where the defendants made over 500 requests in their motion for a bill of particulars.  617 F. Supp. at 1026.  The court did not address most of the defendants' arguments, and even in granting requests related to false statements, said only that general allegations of false statements in an indictment were not sufficient, and required the government to "reveal the substance, date, time, and place of each false statement or concealment and persons involved."  *Id.* at 1029.  Here, all of this information has already been provided to the Defendants, both in the Indictment and through discovery.  The Indictment clearly states which documents the Defendants were alleged to have made false statements or omissions in, and notes the dates on which those documents were made.  The documents themselves were provided in discovery; and each document that is alleged to have contained a misstatement or omission was certified by Defendants personally.   Under these circumstances, no further particulars are required.

for a bill of particulars seeking additional details about charged false statements was proper.  There, the defendant was charged with knowingly falsifying police reports with the intent to obstruct justice.  674 F.3d at 198.  The government's indictment included statutory language and noted the date range during which the police reports had been falsified.  The defendant also had information about which specific reports were at issue and the crime with which they were associated.  *Id.* at 203.  The court held that the indictment was sufficiently detailed even where it did not identify every single misstatement or omission made by the defendant.  *Id.*  The court noted, in particular, that the specificity with which the government had identified the reports at issue, in which the misstatements and omissions were made, made it "highly unlikely that [defendant would] be unfairly surprised at trial."  *Id.* at 203-04.

Similarly, in *United States v. Lacerda*, No. 12-cr-303, 2013 WL 3177814 (D.N.J. June 19, 2013), which the Defendants do not cite, the court declined to grant a bill of particulars requesting additional information regarding false statements and omissions were the indictment was sufficiently detailed and the Government had already provided the defendants with discovery.  The court noted that requests related to "specific misrepresentations [defendants] allegedly made. . . [was] outside the purview of a bill of particulars.  2013 WL 3177814 at * 15.  The indictment in *Lacerda*, like the Indictment here, included information about misrepresentations made by the defendants, and also included information about the time and date those specific misrepresentations were made.  *Id.*  As a result, the government was not required to disclose more.  *See*

67

*also United States v. Sourlis*, 953 F. Supp. 568 (D.N.J. 1996) (denying a request for a bill of particulars in a conspiracy and fraud case where the indictment provided defendants enough detail about specific misrepresentations made during the course of the charged conspiracy).

Here, the Indictment and the information provided in discovery, which includes the specific questionnaires filled out by each Defendant, appropriately provide the Defendants with information related to the allegations against them. The Defendants' requests amount to "wholesale discovery of the Government's evidence," *Sourlis*, 953 F. Supp. at 579 (quoting *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1974)), and should be denied.[13]

---

[13] Coburn also requests that, to the extent the Court denies his motion for a bill of particulars, the Court should strike the "including, but not limited to" language in Count Twelve as surplusage. (Coburn MBP Br. at 18 n. 2.) As noted in Footnote 4, *supra*, a court should grant a motion to strike only if the defendant can show that the contested language in the Indictment is "both irrelevant (or immaterial) and prejudicial." *Hedgepeth*, 434 F.3d at 612. The language in the Indictment does not meet that standard. Defendant does not argue that the language is prejudicial, nor does he argue that it would cause the jury to infer that he was involved in more offenses than those charged in the Indictment. The phrase "including, but not limited to" refers to various internal controls at Cognizant; it does not refer to additional offenses that the Defendant may have committed. The cases Defendant cites are distinguishable because they involved language that the court found to be prejudicial to the defendant. *See United States v. Espy*, 989 F. Supp. 17, 35 (D.D.C. 1997) (granting motion to strike "including, but limited to" because the language suggested uncharged misconduct); *United States v. Hubbard*, 474 F. Supp. 64, 82 (D.D.C. 1979) (striking language that occurred in sixty-nine places throughout the indictment because it was prejudicial); *see also United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980) (noting in passing, in an opinion upholding a conviction, that the trial court should have struck the words "including, but were not limited to, the following," which appeared throughout the indictment, but found no error in the fact that it had not).

### 7.    Requests for Detail Regarding the Specific Portions of the FCPA Defendants are Alleged to have Violated

Both Defendants make several requests for particulars relating to the specific portions of 15 U.S.C. 78dd-1 that apply to their conduct, including the stated purpose of the alleged unlawful payment.  (Coburn MBP Br. at 25; Schwartz Br. at 37-38.)  Schwartz's requests are much broader than Coburn's, as he additionally requests information relating to the agents authorized to pay the bribe; the person to whom the illegal payment was made; the amount that Defendants knew or believed would be offered; the amount offered or given to a foreign official; and the identities of the individuals that offered money to a foreign official.  (Schwartz Br. 38-39.)  This request in many ways overlaps with Schwartz's demands in Sections II.A-II.D of his motion for a bill of particulars. Finally, Schwartz seeks that the Government specify his use of the means and instrumentalities of interstate and international commerce with respect to Counts Two through Four of the Indictment.

To the extent that the Government has already explained why Schwartz's demands relating to additional details regarding the bribe payment should be denied in Sections IV.B.2-3, *supra* pp. 47-55, the Government will not repeat those arguments here.  Nonetheless, the logic of *Jackson* and *Straub* is equally applicable with respect to this set of requests.  The Government is not required to name every individual involved with the bribe payment.  The FCPA prohibits using "any person" or intermediary to facilitate a bribe to any "foreign official." *Straub*, 921 F. Supp. 2d at 265.  It would be equally perverse to "read into the statute" a requirement that the defendant know precisely which intermediaries

69

were acting on his behalf as it would to require that he know the government official receiving the bribe, because he could avoid criminal exposure by making sure he never learned exactly who was going to pay the bribe on his behalf, and to whom. *See Jackson*, 908 F. Supp. 2d at 850. Moreover, as the Government has already noted, for the purposes of this motion, there simply is no additional information to give the Defendants. The Government has already provided Defendants with all of the information in its possession with respect to those questions.

Likewise, as explained in its opposition to Schwartz's motion to dismiss Counts Two through Four, in Section I, *supra* pp. 14-23, the Government is not required to allege that Schwartz himself sent the communications at issue in those counts of the Indictment. The Government has already provided sufficient detail as how Schwartz used the means and instrumentalities of interstate and international commerce in the Indictment, through the extensive discovery already provided, and in this Opposition.

With respect to the remaining portions of both Defendants' motions regarding the portions of the statute that apply to Defendants' conduct, they are charged with having violating 15 U.S.C. §§ 78dd-1(a)(1) and (a)(3). The Government does not allege that the Defendants made a corrupt payment to a foreign political party or foreign candidate for office pursuant to Section 78dd-1(a)(2). To the extent the Defendants seek any further information as to the specific sections of the statute that apply, the Court should deny their request.

At this stage in the proceedings, the Government is not required to provide particulars as to the purpose for which the Defendants are alleged to have violated the FCPA, which would necessarily require the Government to know the identity of the government official who received the bribe.  (Schwartz Br. at 37-38.)  As the *Jackson* court noted, in discussing the three purposes for an unlawful payment under 15 U.S.C. § 78dd-1(a)(3), Section 78dd-1(a)(3)(A)(iii) "provides that the purpose element can be satisfied by factual allegations that a payment was made with the purpose that *some* foreign official would be paid money to secure *some* improper advantage, which also does not appear to require allegations about the individual's job responsibilities."  908 F. Supp. 2d at 849-850 (emphasis in original).  The court looked to purpose and history of the FCPA, and explained:

> The Court seriously doubts that Congress intended to hold an individual liable under 15 U.S.C. § 78dd-1(a)(3)(A) only if he took great care to know exactly whom his agent would be bribing and what precise steps that official would be taking.  Congress intended to address the problems of domestic entities bribing foreign officials to accomplish certain proscribed ends, not domestic entities carefully monitoring the execution of that bribery.

*Id.* at 850.  Thus, Defendants' requests should be denied.

### 8. Requests for Information Regarding Failing to Implement and Circumventing Internal Accounting controls

Both Defendants seek additional detail regarding the specific accounting controls they are alleged to have failed to implement or circumvented.  Specifically, both Coburn and Schwartz request that the Government state whether each failed to implement or circumvented Cognizant's internal controls; the specific controls at issue; and to describe its theory for how he failed to

71

implement or circumvented internal controls.  (Coburn MPB Br. at 15, Schwartz Br. at 36.)  Schwartz additionally requests information about the "ways in which Cognizant's system of internal controls failed to provide the reasonable assurances described in paragraph 27(c) of the Indictment.  (Schwartz Br. at 36-37.)

The Government is not required to specify whether the Defendants failed to implement or circumvented Cognizant's internal controls.  As explained in Section III, *supra*, the Government is entitled to charge offenses – in a statute worded in the disjunctive – in the conjunctive and prove them in the disjunctive. In light of that, the Government need not elect between one charging theory at this time.  Defendants' attempts, at this stage in the proceedings, to narrow the Government's theory of liability with respect to Count Twelve is improper.  Courts have routinely denied requests in cases where statutory language is stated in the conjunctive in an Indictment.  *See e.g.*, *United States v. Williams*, No. 6:13-cr-26, 2013 WL 12203173, at * 2 (M.D. Fl. Aug. 22, 2013) (government not required to provide a bill of particulars specifying whether defendant was accused of "persuading, inducing, and enticing" a minor to engage in sexual activity where the indictment phrased in the conjunctive a disjunctive statute); *United States v. Cerna*, No. 08-cr-0730, 2009 WL 2998929, at *4 (N.D. Cal. Sept. 16, 2009) (denying a motion for bill of particulars where the indictment charged statutory alternatives in the conjunctive, noting that though "the government will eventually have to prove one of those alternatives, [] at this stage the indictment is adequate to put defendant on notice of the charges and permit him to prepare

a defense"); *United States v. McDavid*, No. CR-S-06-35, 2007 WL 926664, at * 9 (E.D. Cal. Mar. 27, 2007) (denying motion for bill of particulars where a defendant was conjunctively charged with damaging and destroying property because "the government may charge in the conjunctive and prove in the disjunctive without violating a defendant's rights, so a defendant is not entitled to a bill of particulars"). This court should do the same.

The remainder of the Defendants requests are improper attempts to "unduly freeze [the Government] to its proofs at trial." *Boffa*, 513 F. Supp. 444 at 485. As noted above, the detailed nature of the Indictment provides Defendants with sufficient notice of the internal controls they are alleged to have circumvented and failed to implement. Count Twelve of the Indictment states that Defendants "circumvented and caused to be circumvented, and failed to implement, Cognizant's system of internal accounting controls, including, but not limited to, controls relating to payments and approvals for accounts payable, and controls relating to Cognizant's SEC filings, such as Sarbanes-Oxley Quarterly Global 302 Certifications and Annual Report on Form 10-K Proxy Statement Disclosure Questionnaires." Indictment, Count Twelve, ¶ 2; *see also* Indictment ¶29(h). The Government has also provided, in discovery, the controls mentioned in the Indictment and the documents at issue. Thus, the Defendants have sufficient information to prepare their defenses. Accordingly, Defendants' requests should be denied.

### 9.   Request for Detail Regarding the Benefits Schwartz Received

Defendant Schwartz seeks further information about the personal benefits he and his co-conspirators are alleged to have received as a result of the conspiracy charged in Count One of the indictment, specifically with respect to Paragraph 28 of the Indictment.  (Schwartz Br. at 40-41.)  Paragraph 28 of the Indictment, which notes the goal of the alleged conspiracy, states:

> The goal of the conspiracy was for COBURN, SCHWARTZ, and their co-conspirators to illegally benefit Cognizant and themselves by improperly securing and obtaining a required planning permit for the KITS Campus by bribing one or more government officials in India; falsely recording payments relating to the bribe payment on Cognizant's books, records, and accounts; and circumventing and failing to implement Cognizant's internal accounting controls."

The indictment is thus clear as to the benefit Schwartz and his co-conspirators received – the "required planning permit for the KITS Campus."  The Indictment thus provides sufficient detail regarding the benefit received as part of the conspiracy, and no additional detail is required.  Schwartz cites domestic bribery and honest services fraud cases to support his request for particulars relating to personal benefits, however, those cases are inapplicable in the context of a conspiracy to violate the FCPA, which requires that a bribe be paid to secure a business advantage, not a personal benefit.  Accordingly, Schwartz's request should be denied.

## **CONCLUSION**

For the reasons stated above, the Court should deny the Defendants' motions in their entirety.

Respectfully submitted,

CRAIG CARPENITO                          ROBERT ZINK
United States Attorney                   Chief
                                         Department of Justice, Fraud Section

By:   *s/ Nicholas P. Grippo*            By:   *s/ Sonali D. Patel*
NICHOLAS P. GRIPPO                       DAVID A. LAST
COURNEY A. HOWARD                        SONALI D. PATEL
Assistant United States Attorneys        Department of Justice, Fraud Section

Dated: Newark, New Jersey
           December 16, 2019